In the Matter of the Petition of HENRY W. T. STEINWAY, Respondent, for an Inspection of the Books and Records of STEINWAY & SONS; CHARLES H. STEINWAY et al., Appellants.

1. CORPORATIONS — INSPECTION OF BOOKS BY STOCKHOLDER — POWER OF SUPREME COURT. The Supreme Court has the power, upon the petition of a stockholder, to compel by mandamus a domestic manufacturing corporation to exhibit its books for his inspection.

2. STOCKHOLDER'S COMMON-LAW RIGHT TO INSPECTION OF BOOKS. A stockholder has the right at common law to inspect the books of his corporation at a proper time and place, and for a proper purpose.

3. COMMON-LAW RIGHT UNIMPAIRED BY LEGISLATION — GENERAL JURISDICTION OF SUPREME COURT. The common-law right of a stockholder with reference to the inspection of the books of his corporation still exists in this state, unimpaired by legislation; and the Supreme Court has power, as part of its general jurisdiction, to enforce the right, in its sound discretion, upon good cause shown.

*Matter of Steinway*, 31 App. Div. 70, affirmed.

(Argued April 17, 1899; decided June 6, 1899.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered November 15, 1898, reversing an order of the Special Term which denied an application for a writ of peremptory mandamus, and granting the writ.

The facts, so far as material, and the question certified for review, are stated in the opinion.

*Edward C. James* and *G. W. Cotterill* for appellants. The appellants have the right of appeal on the whole case under the Code, independently of the certification of the Appellate Division. (Code Civ. Pro. §§ 190, 2087; *People ex rel.* v. *N. Y. C. & H. R. R. R. Co.*, 156 N. Y. 579.) The allegations of the petition having been fully met and denied by the answering affidavits, and a peremptory writ having been insisted upon, the law of mandamus holds that the answering affidavits must be taken as true and conclusive and they, therefore, constitute a bar to this proceeding. (*People ex rel.* v. *Bd. Suprs.*, 32 Barb. 473; *People* v. *R., W. & O. R. R. Co.*, 103 N. Y. 95; *Comcl. Bank* v. *Canal Comrs.*, 10 Wend. 26; Code Civ. Pro. § 2070; *People* v. *Gree Co.*, 64 N. Y. 600; *People ex rel.* v. *Chenango Co.*, 11 N. Y. 563; *People ex rel.* v. *New York*, 25 Wend. 680; *People* v. *Canal Board*, 13 Barb. 432; *People* v. *Thompson*, 25 Barb. 73; *Matter of Haebler* v. *N. Y. P. Exchange*, 149 N. Y. 418; *People* v. *R., W. & O. R. R. Co.*, 103 N. Y. 95.) The method prescribed by the statute creating this corporation, and by the general statutes and rules and practice of the courts, for the examination of corporate books by a stockholder is exclusive, and is inconsistent with the right claimed in this case to examine the books of account. (L. 1875, ch. 611; *French* v. *McMillan*, 43 Hun, 188; Merrill on Mandamus, 15, 16, § 21; *People ex rel.* v. *N. P. R. R. Co.*, 18 J. & S. 459; *People ex rel.* v. *L. S. & M. S. R. R. Co.*, 11 Hun, 1; *C. C. R. Co.* v. *T. T. S. R. Co.*, 53 How. Pr. 45; *Hoyt* v. *A. E. Bank*, 1 Duer, 652; *Cassard* v. *Hinman*, 6 Duer, 695; *Rex* v. *M. T. Co.*, 2 B. & A. 62.) The law allows no general right

to a stockholder to inspect the books of the corporation. Inspection can only be ordered in aid of a suit brought or defended. (*People ex rel.* v. *L. S. & M. S. R .R. Co.*, 11 Hun, 1 ; *People* v. *U. S. M. R. Co.*, 20 Abb. [N. C.] 192 ; *People ex rel.* v. *Throop*, 12 Wend. 183 ; *People ex rel.* v. *Mott*, 1 How. Pr. 247 ; *People ex rel.* v. *P. M. S. Co.*, 50 Barb. 280 ; *People ex rel.* v. *Eadie*, 63 Hun, 320 ; *People ex rel.* v. *Eaton*, 20 Abb. [N. C.] 172 ; *People ex rel.* v. *N. P. R. R. Co.*, 18 J. & S. 457 ; *People ex rel.* v. *S. L. & S. F. R. Co.*, 44 Hun, 552 ; *Rex* v. *M. T. Co.*, 2 B. & A. 62.) Assuming that the jurisdiction in cases of this kind is discretionary, that discretion is not arbitrary, but is governed by legal rules and was not properly exercised by the Appellate Division in this case. (*People ex rel.* v. *Common Council*, 78 N. Y. 56 ; *People ex rel.* v. *Chapin*, 104 N. Y. 96 ; *People* v. *Green*, 1 Hun, 4.) The petition fails to answer the commonplace requirements that pertain to mandamus. It shows no proper demand for inspection. (Beach on Corp. 154 ; High's Ext. Rem. [2d ed.] 240 ; *People* v. *U. S. M. R. Co.*, 20 Abb. [N. C.] 194 ; *Rex* v. *W. B. C. N. Co.*, 3 A. & E. 447.) The order for the writ of peremptory mandamus by the Appellate Division was unauthorized by the Code. (Code Civ. Pro. §§ 2068, 2069.)

*Wheeler H. Peckham* and *Edward B. Hill* for respondent. The court had full power to grant the writ. (*People ex rel.* v. *L. S. & M. S. R. R. Co.*, 11 Hun, 1 ; *Matter of Sage*, 70 N. Y. 222 ; *People ex rel.* v. *Eadie*, 63 Hun, 320 ; *People ex rel.* v. *S. L., etc., R. Co.*, 44 Hun, 552 ; *People ex rel.* v. *N. F. Co.*, 86 Hun, 128 ; *King* v. *M. T. Co.*, 2 B. & Ad. 115 ; *Matter of Burton*, 31 L. J. Q. B. 62 ; *Cockburn* v. *Union Bank*, 13 La. Ann. 289 ; *People* v. *Walker*, 9 Mich. 328 ; *Rosenfeld* v. *Einstein*, 46 N. J. L. 479 ; *Commonwealth* v. *P. Iron Co.*, 105 Penn. St. 111.)

VANN, J. Steinway & Sons, once a copartnership, became a corporation in 1876 under the General Manufacturing Act of 1848, and the relator has been a stockholder therein ever since.

He now holds 1,440 shares of its stock of the par value of $144,000, out of a total of 20,000 shares of the value of $2,000,000, but with an actual value much in excess of that sum. ·He has not been an officer of the corporation since 1881, and he has had no means of knowing much about the management of its affairs since 1892, when he was given an opportunity to examine the books. Since then he has been substantially ignorant as to all the details of the management and has had no access to the books or records. Learning of certain practices that he considered improper, on April 12th, 1894, and March 27th, 1895, he made protests in writing to the company, but no attention was paid to them. On the 6th of April, 1896, he made a written request for leave to examine the books, but receiving no reply, on the 15th of that month he wrote requesting information, proper in character, upon certain subjects, and to this communication he received an answer from the secretary, dated April 23rd, 1896, written in behalf of the board of trustees, virtually refusing the information asked for on the ground that the relator intended to use it in "hostility to the interest of the stockholders." On the 5th of April, 1897, he endeavored to ascertain certain material facts at the annual meeting, but without success, and thereupon he requested the officers and directors to afford his accountants and attorneys access to the books of account, vouchers and records of the company for the years 1892 to 1896, inclusive, for the purpose of examining the same. Receiving no reply, on the 8th of May, 1897, he served a written request upon the treasurer for a statement in writing, under oath, of the affairs of the company, embracing a particular account of all its assets and liabilities for each of the several fiscal years from 1892 to 1896, inclusive, and in response to this he received a general statement placing the assets at more than three millions of dollars, but distributed into only fourteen items, eight of which were over $100,000 each. The liabilities included but eight items, three of which were the capital stock, the surplus and the profit of 1896. This was the first information as to the company's affairs which the petitioner had been able to obtain,

in five years, except that he once saw the balance sheet and inventory of January, 1893. Since 1891 the dividends declared by the company have dwindled in amount. In 1896 the dividend was only five per cent, but never before since 1883 had less than ten per cent, and sometimes as much as eighteen and twenty per cent, been divided in dividends.

The relator claimed in his petition for a writ of mandamus to permit inspection of the books, that the officers of the corporation were engaged in an attempt to form an English stock company for the control of its business, with the design of selling their shares of the capital stock, or exchanging them for a much greater amount of shares in the English company, and that efforts had been made by the stockholders and officers to induce him to sell his stock at $250 a share; but, as he insisted, it was impossible for him to fix upon any price without an opportunity to investigate the condition of the company. He specified various acts which he alleged to be improper on the part of the officers, such as the payment of exorbitant rentals, carrying on a banking business, allowing unusual rates of interest, inventorying the assets too low and paying the trustees salaries with no equivalent in services.

The opposing affidavits contain a large amount of matter relating to aggravating conduct on the part of the relator in the past, and alleging improper motives and ulterior aims on his part. Many general allegations of the petition were denied *in hæc verba*, without stating the real facts. The president and other officers of the corporation denied the allegations of improper conduct on their part and claimed that the relator wished to force them to buy him out at an extravagant price. As no alternative writ was issued and the relator proceeded to argument upon his petition and the opposing affidavits, his right to a peremptory writ depends upon the conceded facts, the same as if he had demurred to the allegations of the defendants. (*People ex rel. City of Buffalo* v. *N. Y. C. & H. R. R. R. Co.*, 156 N. Y. 570; *Matter of Haebler* v. *New York Produce Exchange*, 149 N. Y. 414; *People ex rel. Corrigan* v. *Mayor, etc.*, 149 N. Y. 215; *Peo-*

*ple* v. *R.*, *W. & O. R. R. Co.*, 103 N. Y. 95 ; Code Civ. Pro. § 2070.)

While many of the facts alleged in the petition were denied, enough were left undenied to present a case for the exercise of judgment and discretion on the part of the Supreme Court, provided it has power in any case not expressly covered by statute, to authorize the inspection, wholly or in part, of the books of a manufacturing corporation, upon the application of a stockholder.

The Special Term denied the application of the relator for a peremptory writ of mandamus commanding the officers of the corporation to exhibit certain of its books and papers to him, but upon appeal to the Appellate Division the order of the Special Term was reversed by a divided vote, and the prayer of the petition granted, with certain regulations as to the time, place and manner of exhibiting the books and papers. The Appellate Division allowed an appeal to this court and certified the following question for decision : " Has the Supreme Court the power, upon the petition of a stockholder, to compel by mandamus the corporation to exhibit its books for his inspection ? "

The relator does not claim that the power in question has been conferred upon the court by statute, but he insists that it is a part of its inherent power. This position involves an inquiry into the origin and extent of the authority of the Supreme Court and its power of visitation, or of examining into the affairs of corporations according to the common law.

The origin of the Supreme Court was through a statute passed by the legislature of the colony of New York on the 6th day of May, 1691, whereby, among other things, it was enacted " that there shall be held and kept a Supreame Court of Judicature, which shall be Duely & Constantly kept att the Citty of New Yorke and not Elsewhere, att the severall & Respective times hereafter mentioned. And that there be five Justices at Least appointed & Commissionated to hold the same court, two whereof together with one Chief Justice to be a Quorum. Which Supream Court are hereby fully

Impowered and Authorized to have Cognizance of all pleas, Civill Criminall, and Mixt, as fully and amply to all Intents & purposes whatsoever, as the Courts of Kings Bench, Comon Pleas, & Exchequer within their Majestyes Kingdome of England, have or ought to have,   \*   \*   \*   ." This statute was to remain in force for only two years, but it was renewed, recognized and continued by colonial act or royal ordinance substantially in the words quoted until the adoption of our first Constitution. (1 Col. Laws, pp. 226–229, 303–306, 358, 380 ; 2 id. 462, 639, 948 ; 3 id. 546, 780, 1007 ; 4 id. 1088 ; 5 id. 73.) As has been well said by a recent writer, " This act founded the Supreme Court. \* \* \* Not only did this act erect the tribunal which still continues the great law court of the state, but it vested in it a jurisdiction which change of government and constant reforms and revolutions in procedure have been powerless to abridge in any material respect, for while its jurisdiction has been enlarged by its union with the Court of Chancery, its ancient jurisdiction still remains unimpaired. The Supreme Court of the province was the instrument by which the great body of the jurisprudence of the English common law was applied to New York." (Fowler's Organization of the Supreme Court, 19 A. L. J. 211.) The Court of Chancery was created, or as some insist, continued, by the same act and was subsequently kept in force in the same way. (Hoffman's Chancery Practice, 14 ; Graham's Jurisdiction, 140.) Aside from the colonial statutes, which created and continued such courts only for fixed terms, royal ordinances were resorted to when the legislature failed to act, upon the theory that such action was authorized by the charter of the colony The most notable were those passed by the governor and council on the 15th of May, 1699, and the 3rd of April, 1704, which are referred to by the revisers in a note to 1 R. L. 213, and published in full in appendix No. 5 at the end of the second volume of the Revised Laws. These ordinances, which were questioned but never overthrown, are substantially the same as the original act of 1691. (Chalm. Col. Op. 249 ; 5 Col. Doc. 952 ; 1 E.

D. Smith, Introduction, 50.)   The Supreme Court as thus
continued by Lord Bellamont's ordinance of 1699 and the
Court of Chancery· as continued by ordinance on the 20th
of August, 1701, and the 7th of November, 1704, were the
same tribunals and possessed the same powers as those organized
by the colonial legislature. (Appendix No. 7, 2 R. L. 13.)
They were still in existence and exercising their powers when
the convention met to organize a state government.

"Such parts of the common law of England and of the
statute law of England and Great Britain, and of the acts of
the legislature of the Colony of New York, as together did
form the law of the said Colony on the 19th of April, 1775,"
were made and continued the law of this state by its first
Constitution. (Const. of 1777, § 35.)   While that instrument
neither created nor continued the Supreme Court or the Court
of Chancery, except as stated above, it treated both as exist-
ing tribunals, for it alluded to the chancellor and the justices
of the Supreme Court, regulated their terms of office and
conferred upon them the power of appointing clerks for their
respective courts·   They thus explicitly recognized them as
continuing in power under the state government as they had
previously existed under the colonial government. (Id. §§ 33–
37, 41.)

The second Constitution contained similar provisions, as to
what constituted the law of the state, except that it omitted
"the statute law of England and Great Britain," and abro-
gated such parts of both common and statute law "as are
repugnant to this Constitution." (Const. of 1821, art. 5, §§ 1
to 7; art. 7, § 13.)

The third Constitution abolished the Court of Chancery
and enacted that there should "be a Supreme Court having
general jurisdiction in law and equity." (Const. of 1846, art. 6,
and section 8 of art. 14.)   It repeated the provisions as to
what should be the law of the state. (Id. art. 1, § 17.)

The Revised Constitution now in force continues the
Supreme Court "with general jurisdiction in law and equity,"
and provides that "such parts of the common law, and of the

acts of the legislature of the Colony of New York, as together
did form the law of the said colony, on the nineteenth day of
April, one thousand seven hundred and seventy-five, and the
resolutions of the Congress of the said Colony, and of the con-
vention of the state of New York, in force on the twentieth
day of April, one thousand seven hundred and seventy-seven,
which have not since expired, or been repealed or altered; and
such acts of the legislature of this state as are now in force,
shall be and continue the law of this state, subject to such
alterations as the legislature shall make concerning the same."
(Art. 1, § 16; art. 6, § 1; *Koch* v. *Mayor, etc.,* 152 N. Y. 72, 76;
*Matter of Knowack,* 158 N. Y. 482, 487.) It is provided by sec-
tion 217 of the Code of Civil Procedure that "the general juris-
diction in law and equity, which the Supreme Court of the State
possesses, under the provisions of the Constitution, includes
all the jurisdiction, which was possessed and exercised by the
Supreme Court of the Colony of New York, at any time, and
by the Court of Chancery in England, on the 4th day of July,
1776; with the exceptions, additions, and limitations, created and
imposed by the Constitution and laws of the state. Subject to
those exceptions and limitations, the Supreme Court of the
state has all the powers and authority of each of those courts,
and exercises the same in like manner." (See, also, 1 R. S.
173, § 36; Id. 196, § 1; L. 1847, ch. 280, § 16.) Thus we
have the powers of the Court of King's Bench and the Court
of Chancery as they existed when the first Constitution was
adopted, blended and continued in the Supreme Court of the
state, except as modified by Constitution or statute.

The right of a corporator, who has an interest in common
with the other corporators, to inspect the books and papers of
the corporation, for a proper purpose and under reasonable
circumstances, was recognized by the Courts of King's Bench
and Chancery from an early day, and enforced by motion or
mandamus, but always with caution so as to prevent abuse.
(*Rex* v. *Fraternity of Hostmen,* 2 Str. 1223 and note;
*Gery* v. *Hopkins,* 7 Mod. 129, case 175; *Richards* v.
*Pattinson,* 1 Barnes' Notes of Cases, 156; *Young* v. *Lynch,*

1 Sir W. Blackstone, 27 ; *The King* v. *Shelley*, 3 D. & E. 141 ; *The King* v. *Babb*, 3 D. & E. 579, 580 ; *The King* v. *Merchant Tailors' Company*, 2 B. & A. 115 ; *In re Burton*, L. J. [31 Q. B.] 62 ; *In re West Deven Mine*, L. R. [27 Ch. Div.] 106.) Lord Kenyon, in rendering judgment in *The King* v. *Babb*, assumed " that in certain cases the members of a corporation may be permitted to inspect all papers relating to the corporation." In *Gery* v. *Hopkins* the court, on granting the order to produce, said : " There is great reason for it, for they are books of a public company and kept for public transactions, in which the public are concerned, and the books are the title of buyers of stock by act of Parliament." In *Rex* v. *Fraternity of Hostmen*, the reporter states that the court said : " Every member of the corporation had, as such, a right to look into the books for any matter that concerned himself, though it was in a dispute with others."

The following cases arose in this state, but the most of them are not strictly in point, as they rest mainly upon statutory authority, which does not extend to the case in hand : *People ex rel. Hatch* v. *L. S. & M. S. R. R. Co.* (11 Hun, 1 ; affirmed, *sub nom. Matter of Sage*, 70 N. Y. 222); *People ex rel. Stobo* v. *Eadie* (63 Hun, 320 ; 133 N. Y. 573); *Cotheal* v. *Brouwer* (5 N. Y. 562); *People ex rel. Onderdonk* v. *Mott* (1 How. Pr. 247); *People ex rel. Harriman* v. *Paton* (20 Abb. [N. C.] 172, 195); *People ex rel. Richmond* v. *Pacific Mail Steamship Co.* (50 Barb. 280); *People ex rel. Field* v. *Northern Pacific R. R. Co.* (18 J. & S. 456); *People ex rel. Clason* v. *Nassau Ferry Co.* (86 Hun, 128); *Central Crosstown R. R. Co.* v. *Twenty-third Street Ry. Co.* (53 How. Prac. 45); *People ex rel. Muir* v. *Throop* (12 Wend. 183).

The courts of other states compel the officers of corporations to allow stockholders to examine the books upon due application for a proper purpose.

In *Lewis* v. *Brainerd* (53 Vt. 520) the court said : " The shareholders in a corporation hold the franchise and are the owners of the corporate property, and as such owners they have the right, at common law, to examine and inspect all the

books and records of the corporation at all seasonable times, and to be thereby informed of the condition of the corporation and its property."

In *Huylar* v. *Cragin Cattle Co.* (40 N. J. Eq. 392, 398) it was said : " Stockholders are entitled to inspect the books of the company for proper purposes at proper times, and they are entitled to such inspection, though their only object is to ascertain whether their affairs have been properly conducted by the directors or managers. Such a right is necessary to their protection. To say that they have the right, but that it can be enforced only when they have ascertained, in some way without the books, that their affairs have been mismanaged, or that their interests are in danger, is practically to deny the right in the majority of cases. Oftentimes frauds are discoverable only by examination of the books by an expert accountant. The books are not the private property of the directors or managers, but are the records of their transactions as trustees for the stockholders."

In *Commonwealth* v. *Phœnix Iron Co.* (105 Pa. St. 111, 116), the rule was laid down that, " unless the charter provides otherwise, a shareholder in a trading corporation has the right to inspect its books and papers and to take minutes from them for a definite and proper purpose at reasonable times. The doctrine of the law is that the books and papers of the corporation, though of necessity kept in some one hand, are the common property of all the stockholders." Upon a second appeal in the same case, *sub nom. Phœnix Iron Company* v. *Commonwealth* (113 Pa. St. 563, 572), the court said : " Under the circumstances mentioned for the purposes stated, we are of opinion that according to our ruling when the case was here before, the relator is clearly entitled to an examination of the books and papers of the company. Such a right is, of course, not to be exercised to gratify curiosity, or for speculative purposes, but in good faith and for a specific honest purpose, and where there is a particular matter in dispute involving and affecting seriously the rights of the relator as a stockholder. * * * A stockholder in a trading corporation

must certainly have some rights which a board of directors should respect. Sellers (the relator) was not bound to accept the mere statement of the board, whether under oath or otherwise, as to the contents of the books, etc He had a right to a reasonable personal inspection of them, and with the aid of a disinterested expert might make such extracts as were reasonably required in the preparation of the bill he purposed to bring. The relator, we think, has a clear right under the writ and return to the relief he asks, and it is plain that he has no specific legal remedy for the enforcement of that right; and the existence of a supposed equitable remedy is not a ground for refusing the mandamus."

In *Cockburn* v. *Union Bank of Louisiana* (13 La. Ann. 289, 290), the court, in granting a mandamus requiring the officers of a corporation to allow access by a stockholder to the books, said: " A stockholder in a corporation possesses all his individual rights except so far as he is deprived of them by the charter or the law of the land; as long then as the charter or the rules and by-laws passed in conformity thereto, and the law, do not restrict his individual rights, he possesses them in full and can demand to exercise them. It cannot be denied that it is the right of every one to see that his property is well managed and to have access to the proper sources of knowledge in this respect." The same court in a like case declared that a stockholder in a trading corporation " has in the very nature of things, and upon principles of equity, good faith and fair dealing, the right to know how the affairs of the company are conducted, whether the capital of which he has contributed so large a share is being prudently and profitably employed or otherwise. \* \* \* In order to comply with this call and to vote understandingly, it was certainly requisite for the relator to know the condition of the affairs and business operations of the company and be enabled from this knowledge to act for the best interests of the stockholders and of the company." (*State of Louisiana* v. *Bienville Oil Works Co.*, 24 La. Ann. 204, 208; see, also, *Stone* v. *Kellogg*, 46 N. E. Rep. [Ill.] 222; *Stettauer* v. *N. Y. & Scranton Con. Co.*, 42

N. J. Eq. 46 ; *People* v. *Walker*, 9 Mich. 328 ; *State* v. *Bergenthal*, 72 Wis. 314.)

The elementary works unite in holding that a corporator has the right in question, and that mandamus is a proper remedy.   Mr. Wait, in his work on Insolvent Corporations, after reviewing the authorities, says : " It will be apparent from an examination of these authorities that the rule in favor of a stockholder's right of inspection and investigation of corporate books and papers is becoming very broad and general." (§ 504.)   But while the learned author recognizes the rule, he insists, and we agree with him, that an inspection should " not be granted to facilitate speculative schemes or to gratify idle curiosity."   He declares that " mandamus is the most complete and effective form of redress available to a stockholder or party in case of a denial of the right of inspection." (§ 516.)   Mr. Cook, in discussing the question, says that " the stockholders of a corporation had, at common law, a right to examine, at any reasonable time and for any reasonable purpose, any one or all of the books and records of the corporation.   This rule grew out of an analogous rule applicable to public corporations and to ordinary copartnerships, the books of which, by well-established law, are always open to the inspection of members."   (2 Cook on Corporations, § 511.)

" The prevailing doctrine in the United States is said to permit an incorporator the same freedom in examining the books of the company as a partner has with respect to the books of his firm, but the right only extends to such documents as are necessary to the stockholder's particular purpose. *   *   *   Statutes giving the shareholders of corporations the right to inspect the corporate books have been passed in many of the American states and in England.   These statutes, however, do not supplant the common-law right."   (1 Beach on Private Corp. § 75.)

Judge Thompson, in his work on Corporations, says : " One of the privileges incident to ownership of stock in a corporation is that of an inspection of the books and condition of the company, and this privilege, in general, becomes a right

when the inspection is sought at proper times and for proper purposes." (§ 4406.) He further declares that when the right is guaranteed by statute the motive for its exercise is immaterial, but when it rests upon the common law it will not be allowed for speculative purposes, the gratification of curiosity, or where its exercise would produce great inconvenience. (§§ 4412–4420. See, also, Angell & Ames on Corp. [9th ed.] § 681; Morawetz on Corp. § 473; High's Extraordinary Legal Remedies, § 308; 19 Am. & Eng. Ency. of Law, 231.)

We think that, according to the decided weight of authority, a stockholder has the right at common law to inspect the books of his corporation at a proper time and place, and for a proper purpose, and that if this right is refused by the officers in charge a writ of mandamus may issue, in the sound discretion of the court, with suitable safeguards to protect the interests of all concerned. It should not be issued to aid a blackmailer, nor withheld simply because the interest of the stockholder is small, but the court should proceed cautiously and discreetly, according to the facts of the particular case. To the extent, however, that an absolute right is conferred by statute, nothing is left to the discretion of the court, but the writ should issue as a matter of course, although even then, doubtless, due precautions may be taken as to time and place so as to prevent interruption of business, or other serious inconvenience.

The appellants, however, insist that certain statutory provisions relating to the subject are exclusive, and as they do not extend to the case under consideration, that the Appellate Division had no right to grant the writ. The history of legislation upon the subject in brief is as follows: By the General Manufacturing Act of 1848 it was made the duty of the trustees of corporations organized under it to keep a transfer book, which was required to "be opened for the inspection of stockholders and creditors of the company," substantially every business day at the office of the corporation. (L. 1848, ch. 40, § 25.) This section was subsequently amended so as to require

the treasurer to make a statement of the affairs of the company upon the request of persons owning a specified percentage of the capital stock.  (L. 1854, ch. 201, § 1 ; L. 1862, ch. 472, § 1.)  The Business Corporations Law of 1875 required the directors of corporations organized thereunder " to cause to be kept at its principal office or place of business, correct books of account of all its business and transactions, and every stockholder in such corporation shall have the right at all reasonable times by himself or his attorney to examine the records and books of account of such corporation."  (L. 1875, ch. 611, § 16.)  These statutes were all repealed in 1892 by the General Corporation Law.  (L. 1892, ch. 687, pp. 1816–1819.)  During the same year the Stock Corporation Law was passed, which provides that every stock corporation shall keep a stock book, which ": shall be open daily, during business hours, for the inspection of its stockholders and judgment creditors, who may make extracts therefrom."  (L. 1892, ch. 688, § 29.)  It also requires the treasurer, upon the request of stockholders owning a fixed percentage of the capital stock, to furnish a statement of all its assets and liabilities.  (Id. § 52.)

We do not think that the statute now in force is exclusive, or that it has abridged the common-law right of stockholders with reference to the examination of corporate books.  By enabling a stockholder to get some information in a new way, it did not impliedly repeal the common-law rule which enabled him to get other information in another way, for the courts do not hold the common law to be repealed by implication, unless the intention is obvious.  By simply providing an additional remedy the existing remedy was not taken away.  The statute merely strengthened the common-law rule with reference to one part thereof, and left the remainder unaffected.  It dealt with but a single book, and as to that it amplified the qualified right previously existing, by making it absolute and extending it to judgment creditors.  The stock book has no relation to the business carried on by a corporation, and the change was doubtless made to enable stockholders to promptly learn who are entitled to vote for directors, and judgment creditors to

learn who are liable as stockholders for a failure to comply with the provisions of the act. The statute is silent as to the other books, and provides no system of inspection as a substitute for the right of examination at common law. The provision for a report from the treasurer was not designed to take away an old right, but to give a new one, not as a substitute but as an addition.

We think that the common-law right of a stockholder with reference to the inspection of the books of his corporation still exists, unimpaired by legislation ; that the Supreme Court has power, in its sound discretion, upon good cause shown, to enforce the right, and that such power is a part of its general jurisdiction as the successor of the courts of the colony of New York, which had the jurisdiction of the Court of King's Bench and the Court of Chancery in England.

It follows that the order appealed from should be affirmed, with costs, and that the question certified should be answered in the affirmative

All concur.

Order affirmed.