(28 Misc. Rep. 726.)

### In re PIERSON.

(Supreme Court, Special Term, New York County. August 28, 1899.)

CORPORATIONS—RIGHT OF STOCKHOLDER TO EXAMINE BOOKS—MANDAMUS.

　　An application for a mandamus to compel a corporation to permit a stockholder to examine its books is addressed to the discretion of the court, and the writ will only be granted when necessary in furtherance of justice; and the mere fact that a gas company, formed by the consolidation of other companies, has not declared a dividend in 15 months of existence, and that it has reduced the price of gas to meet competition of other companies, is not alone sufficient ground for compelling it to submit to the examination of a single stockholder, who owns but a small fraction of 1 per cent. of its stock, to enable him to determine whether or not the company is supplying gas at a loss.

Petition of J. Fred Pierson, a stockholder in the New Amsterdam Gas Company, for a mandamus to compel the company to permit petitioner to examine its books. Denied.

Evarts, Choate & Beaman (Treadwell Cleveland, of counsel), for the motion.

John C. Tomlinson, opposed.

McADAM, J. The petitioner, the owner and holder of $15,000 in consolidated gold bonds and of 75 shares of the preferred stock of the New Amsterdam Gas Company, applies for a writ of mandamus compelling the company to exhibit to him, his attorneys and accountants, all its books of account, records, and papers from the time of its incorporation, and to permit them to fully examine the same, and to take extracts therefrom. The New Amsterdam Company was organized early in 1898 by the consolidation of the Equitable, the New York & East River, and the New Amsterdam Companies, with a preferred stock of the par value of $10,000,000, and a common stock of $13,000,000, independently of a large bonded debt secured by a mortgage and deed of trust. The petitioner was a stockholder in the Equitable Company, and consented to the consolidation on the plan by which the scheme was consummated. As a bondholder the petitioner has no claim to the inspection claimed, but as a stockholder he may have, if he makes out a proper case. "The writ of mandamus, however, does not issue herein as a matter of course. It is an extraordinary remedy, to be invoked only upon special occasions. The courts do not grant the mandamus until it has taken into careful consideration all the facts and circumstances of the case. The condition and character of the books, the reasons for refusal by the corporation, the specific purpose of the stockholder in demanding inspection, the general reasonableness of the request, and the effect on the orderly transaction of the corporate business in case it is granted, are all considered in granting or refusing the writ. It is only granted in furtherance of essential justice." Cook, Stock, Stockh. & Corp. Law (3d Ed.) § 514. The application is addressed to the sound discretion of the court, which is to be exercised with discrimination and care. The reasons for granting it must be clear and cogent. To hold that every person who shows himself to be a holder of stock is

at liberty to ·demand an examination of the entire corporate books and, records by accountants selected by him, when and as often as he pleases, and, if refused, to apply for a writ of mandamus to enforce such right, would be to establish a rule highly prejudicial to the interests of all corporations and their stockholders. People v. Railroad Co., 11 Hun,·1, affirmed in 70 N. Y. 220. The effect on the orderly transaction of the corporate business of such an examination would, in the case of a large corporation like the respondent, be to seriously cripple it, and in this instance the harm which would probably result to the stockholders generally would be far greater than any good which the petitioner could possibly derive therefrom. The gravamen of the petition is that, because the company has reduced the price of gas from $1.10 to 50 cents per 1,000 cubic feet, no dividend has been declared on the stock since April, 1898, and that the petitioner has been paid merely 5 per cent. on the. consolidated bonds since that time; that this condition of affairs is caused by the directors involving the company in a "gas war"; .that the petitioner believes that the company is selling gas below its cost; and that without an examination of the books he cannot tell from what source the company derives its money to pay its fixed charges,—whether from its capital or income. The answering affidavits show, what is a notorious fact, that since May 1, 1899, there has been a "war" among the companies supplying gas in the borough of Manhattan; that the reduction made by the respondent was necessary to enable it to compete with its rivals, and it denies the allegation of the petitioner that long-term contracts for supplying gas at the reduced rate have been made by the company. These affidavits also show that at the time of consolidation, and ever since, there have been in the borough of Manhattan four companies supplying illuminating gas to the inhabitants thereof, to wit, the Consolidated Company, the Standard Company, the Mutual Company, and respondent; that the pipes of the companies have and do parallel each other in many places throughout the borough; and that said companies are in active competition, a condition that has proved highly beneficial to the general public, and demonstrated that, for the public, rivalry is better than monopoly. It clearly appears that the Consolidated Company was the first to cut the rate, after which its agents carried on a canvass for the patronage of the respondent, many of whose customers were induced to go with the cut-rate company; so that the respondent, to retain its business for the benefit of its stockholders, was obliged in self-defense to cut rates also, and this act constitutes the main grievance of the petitioner, and the head and front of the respondent's offending. According to ordinary business methods, the respondent met the attack by adopting the only course wise management could suggest. The petitioner fears that the respondent cannot sell gas at 50 cents per 1,000 cubic feet, and may, in consequence, have to go into insolvency, and perhaps into the hands of a receiver. There seems to be nothing to justify these fears. The petitioner has not furnished any proof by experts that gas cannot be profitably sold at the reduced price; and the fact that a competing company is able to furnish it almost as low, and pay dividends, would seem to prove that there is still

a margin of profit left. At all events, the petitioner's fears, standing alone, do not entitle him to go with accountants into the business place of the respondent, there to rummage over the respondent's books and records since its incorporation, to ascertain the cost of gas,—a fact that can easily be ascertained in a much more simple and practical way upon application to any gas expert. No information contained in the books would aid in settling the "gas war," which must, like many of the "cut-rate wars" of the past, adjust itself. The Consolidated Company was, in this instance, the aggressor, and, if it erred, the responsibility rests with it, and cannot be shifted upon the respondent, for it is in no manner accountable for the condition by which it was confronted. In the Steinway Case, 159 N. Y. 250, 53 N. E. 1103, the petitioner owned stock of the par value of $144,000, with an actual value much in excess of that. The dividends had dwindled down from 20 to 5 per cent. He had been for several years endeavoring to ascertain certain material facts as to the company's condition and acts, and, after a patient struggle in that direction, he was finally obliged to, and did, through the aid of the courts, obtain the information he required. In this instance the consolidation occurred only 15 months ago, and since then the petitioner's holdings have not depreciated; on the contrary, it is undisputed that they are worth $975 more than at the time the consolidation was effected, a result which ought to be accepted as the best test of good management. Interest has been regularly paid on the bonded debt, and the question when a dividend is to be paid on the stock is one resting largely in the discretion of the board of managers. Mor. Priv. Corp. (2d Ed.) § 447 et seq. Many companies, following the example of the Chemical Bank, wait until there is an accumulated surplus before attempting to divide profits; so that the mere omission to pay dividends on stock within 15 months after incorporation does not in itself prove mismanagement, for it may be the result of good judgment. The exercise by the directors of the duties devolving upon them would be seriously interfered with if this application were granted. In reducing the price of the company's product, they have acted within the scope of their authority and honest discretion, and with respect thereto they ought to be free from the interference of even a majority of the shareholders. Taylor, Priv. Corp. (3d Ed.) § 683. The petitioner, as the owner of 75 shares of the preferred stock, is the holder of but about one-thirtieth of 1 per cent. of the capital stock of the company, and the owners of all the other shares seem perfectly content with the management of the company's interests,—a circumstance at once significant and of weight. While there can be no doubt as to the power of the court to grant, in a proper case, relief of the character sought, proceeding "cautiously and discreetly, according to the facts of the case" (In re Steinway, supra), the application must be denied.