OPINION OF THE COURT
Jeffrey M. Atlas, J.
The petitioners in this CPLR article 78 proceeding are “inactive” members of the respondent not-for-profit corporation, the League of American Theatres and Producers, Inc. (the League). The League’s 1985 restated certificate of incorporation and the by-laws state that the corporation’s purposes are, in part:
“(a) To conserve and promote the general welfare of the legitimate theatre and common interests and welfare of theatre owners, lessees or operators, and producers and presenters of plays;
“(b) To afford an organization to enable theatre owners, lessees or operators, and producers and presenters of plays to act for their common purpose and interest;
“(c) To further constitute an organization which will afford and give an opportunity to theatre owners, lessees or operators and producers and presenters of plays to consider their relations among each other and to the public, and to other interests constituting or affecting the theatre.”[1]
In pursuit of these stated purposes the League has participated for many years, along with the American Theatre Wing, *917 in the presentation of the Antoinette Perry Awards, commonly known as the Tony Awards. The League has four classes of members: (1) active members, (2) inactive members, (3) affiliate members, and (4) honorary members, and, in the past, inactive, honorary and most active members participated in voting for the Tony Awards.[2] To be prepared to make their choices, each Tony Awards voter receives a free pair of orchestra seat tickets for each show that may be eligible for a Tony Awards nomination. Additionally, on the night of the Awards each voter receives free tickets to attend the ceremony.
On June 23, 1999, during a special meeting of the Board of Governors, the League amended its by-laws to prevent inactive members from participating in the Tony Awards process. As a result, the petitioners are no longer eligible to be Tony Awards voters, nor do they receive free tickets to all shows that may receive a nomination, nor do they attend the ceremony for free. The petitioners first learned of the amended by-laws in August 1999 from the cover letter of their membership renewal package. Disenfranchised by their new status in the League, the petitioners, through their attorney, attempted to negotiate with the League to regain their place as Tony Awards voters, and demanded copies of the League’s by-laws. This was followed by a number of letters that made various other demands for documents, member lists, and voting lists. Finally, on November 4, 1999, pursuant to Not-For-Profit Corporation Law § 621 (b), the petitioners made a detailed demand to inspect the books, minutes and records of the League. When the League did not comply and later flatly refused certain demands, the petitioners applied to this court, pursuant to N-PCL 621 (d), for an order compelling inspection of various records, and for attorney’s fees and costs.
Since the filing of this petition the League has made numerous documents available to the petitioners. However, according to the petitioners’ reply brief there remains a number of undisclosed records: (1) “[A] 11 handwritten notes made, or any other document or record, including, but not limited to, meeting notices and reports, reflecting the substance of, and discussion at” (a) all meetings of the By-Laws of Membership SubCommittee held to discuss the 1999 by-laws amendments, (b) the June 15, 1999 Executive Committee meeting, (c) the June *918 23, 1999 Board of Governors meeting, and (d) the October 27, 1999 Board of Governors meeting; (2) a membership list showing all members and their classes of membership for the 1998-1999 season; and (3) a list of League members designated as Tony Awards voters for 1998-1999. The League argues they are not required to meet these demands because: (1) the information will be used in violation of N-PCL 621 for a purpose which is in the interest of a business or object other than the business of the League, (2) N-PCL 621 does not require the League to furnish for inspection the documents requested by the petitioners, and (3) N-PCL 621 does not require the League to create lists or documents, for the purpose of inspection by the petitioners, that do not already exist. Finally, the League asserts that the petitioners are not entitled to attorney’s fees under the N-PCL or common law.
The Purpose of the Demand
There is both a common-law and statutory right by shareholders, or members in a not-for-profit corporation, to inspect the books and records of a corporation. (Matter of Crane Co. v Anaconda Co., 39 NY2d 14 [1976]; Matter of Steinway, 159 NY 250 [1899]; N-PCL 621.) However, inspection may be denied to a member who does not have a “proper purpose.” To prove that their purpose is proper, the statute requires members to supply affidavits to the corporation attesting that the information obtained through the inspection “will not be used for a purpose which is in the interest of a business or object other than the business of the corporation.” (N-PCL 621 [c].) Even then the court has an obligation to look beyond the face of those affidavits to determine if there is bad faith on the part of the petitioners. (Matter of Santuccio v Rochester Civic Music Assn., 70 Misc 2d 587 [Sup Ct, Monroe County 1972].) If the court finds that the application is not made in good faith and for proper purpose, then the court may deny the petition. (Matter of Crane Co. v Anaconda Co., supra.)
The League suggests that the petitioners’ purpose is not a proper one because it is purely personal in nature, specifically, that the petitioners simply want free theatre tickets. The petitioners argue that the “bad faith” and acts of alleged misconduct on the part of the League’s officers and directors justify their demand for inspection. Both parties, however, agree that the crux of this dispute is the amended by-laws. The petition states: “This matter involves the amendment of the League’s by-laws by its Board of Governors in June 1999,” and, *919 in fact, the League acknowledges that, “Petitioners’ unhappiness with that amendment has led to their inspection requests,” noting further that the petitioners probably want information to enable them to work toward the repeal of the June 1999 bylaw amendment.
That the petitioners’ interest has a personal aspect to it does not preclude there being a legitimate corporate interest involved. Petitioners in such cases often have something personal to gain in their effort to call corporate policies into question. It is no less a pursuit of legitimate corporate interests to seek to expand the number of Tony Awards voters than to seek to reduce the number of voters. Moreover, it can also be argued that the theatre owner members of the League have a personal financial interest in reducing the number of free tickets distributed for the many shows that may be nominated for a Tony Award. This does not make their decision to alter the League policy any less legitimate.
In addition, among the corporation’s stated purposes, is the desire shared by all members “to afford to its members an opportunity to act for their common purpose and interest * * * and to consider their relations among each other and to the public, and to other interests constituting or affecting the theatre.” It is apparent that petitioners’ effort to continue voting in the Tony Awards is part of the common purpose and in the interest of the League, and surely it cannot be said that the outcome of Tony Awards voting does not affect the theatre industry. A “proper purpose” is one that is germane to the members’ status in the corporation. (Matter of Taylor, 117 App Div 348 [3d Dept 1907].) This includes members’ right “to communicate with fellow members regarding respondent’s amended bylaws” (Matter of Mayer v National Arts Club, 223 AD2d 440 [1st Dept 1996], lv denied 88 NY2d 802 [1996]), and the right to investigate management conduct. (Matter of Tatko v Tatko Bros. Slate Co., 173 AD2d 917 [3d Dept 1991].)
N-PCL 621 and the Scope of the Demand
The League also argues that the petitioners are not entitled to most of the remaining documents in dispute because N-PCL 621 should not be construed as broadly as CPLR 3101, the New York disclosure statute which requires the “full disclosure of all matter material and necessary in the prosecution or defense of an action.” (CPLR 3101 [a].) I agree. A better statute to which to compare N-PCL 621 is the section from which it was adapted, Business Corporation Law § 624, which *920 describes the legal obligations of for-profit corporations to their shareholders who demand the right to inspection of corporate books, records, and minutes. (McKinney’s Cons Laws of NY, Book 37, N-PCL 621, Legislative Studies and Reports, at 264.) In Business Corporation Law § 624, the criteria for limiting shareholders’ inspection is generally premised upon the danger that the corporation might suffer financially if disgruntled shareholders learn and divulge corporate secrets to competitors. (Matter of Tatko v Tatko Bros. Slate Co., supra.) Additionally, there is the concern that an inspection could be so far reaching as to impair the corporation’s ability to carry on its business. (Matter of Beryl v United States Smelting Refin. & Min. Co., 34 Misc 2d 382 [Sup Ct, NY County 1962].) Neither of these dangers exists in this case.
It is in the court’s discretion to exercise its authority to limit or expand the scope of members’ inspection of corporate records to the material necessary to protect their interest in the corporation. (Matter of Matthews v Onondaga County Deputy Sheriff's Benevolent Assn., 225 AD2d 1048 [4th Dept 1996]; Matter of Bondi v Business Educ. Forum, 52 AD2d 1046 [4th Dept 1976].) The right to inspection would be wholly illusory if the corporation was permitted to decide which of its records members were allowed to see (Durr v Paragon Trading Corp., 270 NY 464 [1936]), and unduly burdensome if members were permitted to engage in a fishing expedition. (14 NY Jur 2d, Business Relationships, § 379; Matter of Beryl v United States Smelting Refin. & Min. Co., supra.)
As to the minutes of the By-Laws of Membership SubCommittee meetings, the League’s contention that they are “unable to locate documents responsive” to the petitioners’ demand for these minutes is not a denial that the minutes ever existed, and it is not a satisfactory answer in a situation where the petitioners are entitled to minutes that have been prepared by a sub-committee, and therefore have become part of the corporate records. Given the import of the inspection statute, and the fact that the League is accountable for its corporate records, at the very least the League should disclose to the petitioners whether or not such minutes ever existed. If in fact they exist, then the Sub-Committee minutes should be disclosed. If they once existed but cannot be found, that fact should be disclosed. In any event, the League should give petitioners the reports or memoranda generated as a result of the Sub-Committee meetings which reflect the discussions and recommendations from those meetings.
*921 As for the petitioners’ allegations that the minutes provided to them from the other three meetings are in some way “truncated” or “inaccurate,” I direct that, to the extent that they have not already done so, the League is to provide the petitioners with correct and complete minutes and attachments from the June 15, 1999 Executive Committee meeting, the June 23, 1999 Board of Governors meeting, and the October 27, 1999 Board of Governors meeting. Beyond that, the petitioners provide no law, nor can I find any, that says that the minutes of corporate meetings should be more complete than those I have seen in petitioners’ exhibit D. As long as the minutes bear the signature of the secretary of the meeting as evidence of their accuracy and completeness, I believe this satisfies the League’s obligation under N-PCL 621. (DFI Communications v Greenberg, 41 NY2d 602 [1977], rearg denied 42 NY2d 910 [1977].)
Membership List and List of Tony Awards Voters
Turning to the petitioners’ demand that the League provide them with a membership list naming all members and their classes of membership for the 1998-1999 season rather than the “sanitized” list they have received, the League is directed to provide to the petitioners the 1998-1999 official membership list.
The petitioners also demand a list of League members who are currently designated Tony Awards voters for the 1998-1999 season. They state that they need this list to discover both the extent to which the organizational members of the League have violated the by-laws which limit their participation in Tony Awards voting, and to discover which, if any, inactive members who should now be unqualified to vote for the Tony Awards have been given “special treatment, permitting them to retain their Tony voting privileges for the 1999-2000 season.” The League argues that there is no class of member called Tony Awards voter; therefore, under N-PCL 621, the petitioners are not entitled to inspect any such list. They also argue that they are not required to create a list which does not presently exist so the petitioners may examine it.
I am hard pressed to believe that such a list does not exist; however, even if it is so, the court, in its discretion, can direct the League to create the list the petitioners seek. (Matter of Bohrer v International Banknote Co., 150 AD2d 196 [1st Dept 1989].) In light of the issues in this case, I do not think this is a frivolous request nor one that is intended to harass *922 (Matter of Beryl v United States Smelting Refin. & Min. Co., supra), and I direct the League to give to the petitioners a list of Tony Awards voters for the 1998-1999 season.
Lastly, the petitioners’ request for attorney’s fees and costs is denied. Generally, in the absence of a statute or contractual obligation, attorney’s fees and costs are not recoverable. (Matter of Edelman v Goodman, 47 Misc 2d 8 [Sup Ct, Kings County 1965].)
Therefore, the petition is granted to the extent directed herein.

. In contrast, the League’s 1930 certificate of incorporation stated its purpose as: “To protect the general public, patrons of the theatre, owners of theatrical entertainments, operators of theatres and reputable theatre ticket brokers against the evils of speculation in theatre tickets.”

. The limitation on active members who vote is for institutional members such as the Schubert or Nederlander organizations, each of which is limited to no more than four Tony Awards voters, no matter how many of their group are active members of the League.