■ RETIREMENT PLAN FOR GENERAL EMPLOYEES OF THE CITY OF NORTH MIAMI BEACH et al., Appellants, v THE McGRAW-HILL COMPANIES, INC., Respondent. [992 NYS2d 220]—

Order, Supreme Court, New York County (Jeffrey K. Oing, J.), entered May 21, 2013, which denied the petition to inspect respondent's books and records pertaining to the alleged wrongful conduct of its wholly-owned subsidiary, unanimously reversed, on the law, without costs, the petition granted, and the matter remanded for further proceedings consistent herewith concerning the proper scope of inspection.

Petitioners, Retirement Plan for General Employees of the City of North Miami Beach (North Miami Beach) and Robin Stein, are shareholders of respondent the McGraw-Hill Companies, Inc. (McGraw-Hill). Nonparty Standard & Poor's Financial Services LLC (S&P) is a major credit rating agency wholly owned by McGraw-Hill. S&P issues ratings on securities and other investment products related to those products' default risk; the ratings play a critical role in the economy by driving investment decisions, as many institutional investors have rules that restrict them to investing only in products with high ratings from S&P.

Petitioners allege that under the direction of respondent's chairman and chief executive, S&P undertook a strategy of fraudulently issuing positive ratings on complex financial products such as residential mortgage-backed securities (RMBS), collateralized debt obligations (CDOs), and other similarly packaged mortgage-related products. According to petitioners, this strategy redounded to McGraw-Hill and S&P's

benefit because in many instances, debt issuers whose securities S&P rated were also clients of S&P's services. Therefore, petitioners allege, as the complex mortgage-backed securities industry grew, McGraw-Hill's management directed S&P to further provide optimistic credit ratings in an effort to attract more business from the issuers and gain more revenue from those issuers' complex securities. According to petitioners, the mortgage-related securities at the heart of the meltdown would not have been marketed and sold without S&P's high ratings, none of which accurately reflected the securities' actual risk. Petitioners assert that the rosy credit ratings, which S&P knew to be false, encouraged investment in toxic securities, thus helping to trigger the financial crisis of 2008.

Petitioners note that between August 2007 and November 2007, S&P, along with other major credit rating agencies, came under investigation by several state Attorney Generals' offices and by the United States Securities and Exchange Commission (SEC). These state and federal authorities set out to examine the rating agencies' activities in rating subprime RMBSs and CDOs. Among the main inquiries of the SEC investigation were whether the credit rating agencies complied with their own policies and procedures for initial ratings, the effectiveness of the agencies' conflict-of-interest procedures, and whether conflicts of interest influenced the agencies' ratings—specifically, whether agencies were influenced by receiving compensation from the very issuers and underwriters whose securities they rated.

After conducting its investigation, the SEC issued its conclusions in a July 2008 report. In that report, the SEC found, without attributing conduct to any particular credit rating agency, that the various agencies did not always disclose relevant ratings criteria and that none of them had specific written procedures for rating RMBSs and CDOs. The SEC report also noted, among other things, that although the agencies were required to maintain and enforce policies and procedures designed to manage conflicts of interest, significant conflicts persisted—for example, the "issuer pays" model for RMBS and CDO offerings.

Similarly, in April 2011, the United States Senate Subcommittee on Investigations issued a report emphasizing credit rating agencies' complicity in the 2008 financial crisis—a crisis partially driven by investments in the subprime mortgage securities market. The Senate subcommittee report concluded that the rating agencies' senior management knew of increasing risks in the mortgage markets, such as lax lending standards,

poor quality loans and mortgage fraud. However, the subcommittee stated, instead of using this information to temper their ratings, the agencies continued to issue numerous investment-grade ratings for mortgage-backed securities.

By letter dated November 18, 2011, petitioner North Miami Beach, citing Business Corporation Law § 624 and the New York common law, made a written demand upon respondent to inspect certain books and records of respondent's board of directors.\* The demand listed 15 categories of books and records generally relating to the board of directors' oversight and management of S&P, and also relating to the board's independence. For example, the demand requested records concerning: (1) the board's independence; (2) respondent's policies and procedures regarding the board's oversight of S&P; (3) names of senior employees reporting directly to the board; (4) policies and procedures for issuing credit ratings for RMBSs and CDOs; (5) policies and procedures for addressing and managing conflicts of interest, particularly those arising out of the "issuer pays" model for issuing credit ratings; and (6) the names of respondent's personnel in charge of enforcing a code of business ethics and any other conflict-of-interest policy. North Miami Beach specified the time frame for the production as "January 1, 2002 to the present."

Further, North Miami Beach enumerated the purposes for its demand—among others, to investigate potential wrongdoing and mismanagement by the board of directors; to assess the board's ability to consider impartially a demand for action; to assess policies that the board had implemented to address potential conflicts of interest in S&P's RMBS and CDO business; and to assess policies the board had considered or implemented to address S&P's procedures for issuing RMBS and CDO credit ratings.

Before petitioners commenced this action, the parties engaged in a series of discussions to determine whether they could compromise on the scope of petitioners' demand without any court intervention. Respondent offered for production all documents required by Business Corporation Law § 624—that is, a record of shareholders, shareholder meeting minutes, and profit and loss statements. However, petitioners asserted a demand for additional documents under New York common law, including anything that the board had received or disseminated with respect to credit ratings for RMBSs and CDOs. Petitioners further demanded, also under New York common law, documents

---

\* Petitioner Robin Stein did not join North Miami Beach in making the demand until June 22, 2012.

pertaining to respondent's policies and oversight of S&P, among other things. Nevertheless, respondent refused to produce any documents that were not required under Business Corporation Law § 624, asserting that the request for documents under the New York common law was too broad.

Petitioners alleged that, in later discussions, they made clear that they sought only documents that the board had actually received, prepared, reviewed or distributed, and, of those documents, only the ones concerning the board's knowledge about and oversight of S&P. Thus, petitioners stated, respondent was not obliged to conduct an exhaustive firmwide search for documents, as the requested documents were easily identified and easily obtainable. However, respondent still took the position that petitioners were entitled only to documents required under Business Corporation Law § 624.

When discussions failed to produce any agreement on further documents to be produced, petitioners filed the petition underlying this appeal. Further, petitioners attached to their memorandum of law a "Schedule A" containing only nine categories of documents and making clear that petitioners sought documents only from board members. Petitioners noted that Schedule A constituted an attempt to narrow their prior demands after the series of discussions with respondent.

Supreme Court denied the petition, finding that petitioners should have first made a demand upon respondent and then, once respondent rejected the demand, should have commenced a shareholders' derivative action rather than filing a petition under Business Corporation Law § 624. We disagree.

Under New York law, shareholders have both statutory and common-law rights to inspect a corporation's books and records so long as the shareholders seek the inspection in good faith and for a valid purpose (*see Matter of Dwyer v Di Nardo & Metschl, P.C.*, 41 AD3d 1177, 1178 [4th Dept 2007], quoting *Matter of Peterborough Corp. v Karl Ehmer, Inc.*, 215 AD2d 663, 664 [2d Dept 1995]). The statutory right supplemented, but did not replace, the common-law right (*see Matter of Crane Co. v Anaconda Co.*, 39 NY2d 14, 19-20 [1976]; *Matter of Steinway*, 159 NY 250, 263-265 [1899]).

Here, petitioners sufficiently showed that they were acting in good faith and for a proper purpose in seeking to enforce their common-law right to inspect respondent's books and records. Specifically, the petition alleges that petitioners seek to investigate alleged mismanagement and breaches of fiduciary duty by respondent's board of directors in failing to oversee purported wrongdoing by S&P; this alleged wrongdoing,

petitioners assert, exposed respondent to substantial potential liability in multiple civil actions and investigations. These allegations form a proper basis for petitioners' request (*see Matter of Crane Co.*, 39 NY2d at 20-21).

Contrary to respondent's contentions, investigating alleged misconduct by management and obtaining information that may aid legitimate litigation are, in fact, proper purposes for a Business Corporation Law § 624 request, even if the inspection ultimately establishes that the board had engaged in no wrongdoing (*see Matter of Tatko v Tatko Bros. Slate Co.*, 173 AD2d 917, 918 [3d Dept 1991]). Indeed, petitioners identified several reasons for making their demand, including assessment of policies that the board had implemented when issuing credit ratings and investigation of possible wrongdoing by the respondent's board of directors. Each of these purposes adequately justifies petitioners' access to certain board documents. Moreover, because the common-law right of inspection is broader than the statutory right, petitioners are entitled to inspect books and records beyond the specific materials delineated in Business Corporation Law § 624 (b) and (e) (*see Matter of Ochs v Washington Hgts. Fed. Sav. & Loan Assn.*, 17 NY2d 82, 86-87 [1966]; *see also Rockwell v SCM Corp.*, 496 F Supp 1123, 1126 [SD NY 1980]).

Finally, although petitioners substantially limited the scope of their initial requests by submitting their Schedule A, respondent maintains that the items requested in that schedule are still too broad. On this record, we cannot determine which records are relevant and necessary for petitioners' purposes. A hearing is therefore necessary to determine the proper scope of inspection (*see Matter of Liaros v Ted's Jumbo Red Hots, Inc.*, 96 AD3d 1464, 1465 [4th Dept 2012]; *Tatko*, 173 AD2d at 919). Accordingly, we remand the matter to Supreme Court for that hearing. Concur—Saxe, J.P., Moskowitz, Freedman, Gische and Kapnick, JJ.