In the Matter of the Petition of JOHN C. DAVIES, Attorney-General of the State of New York, Appellant, for an Order Directing CHARLES W. MORSE, Respondent, et al., to Appear before a Referee for Examination.

1. APPEAL — DISCRETIONARY ORDER.    An appeal from an order of the Appellate Division will not be dismissed on the ground that so far as the record discloses it may have been made in the exercise of discretion, where the court allows the appeal and certifies a question of law for review, since it will be presumed under such circumstances that the determination was made upon the merits, unless it expressly appears by the record that it was made in the exercise of discretion.

2. ANTI-MONOPOLY ACT — LAWS OF 1899, CH. 690 — ACTION BY ATTORNEY-GENERAL AGAINST COMBINATION FORMED PRIOR TO PASSAGE OF ACT.    A proceeding against an alleged unlawful combination instituted by the attorney-general under the authority of the Anti-Monopoly Act (L. 1899, ch. 690) is not too late because the combination had been formed before the proceeding was commenced and even before the statute was passed, since the act is a substantial re-enactment of an earlier statute, and, according to the Statutory Construction Law, must be construed as a continuation thereof, and, as it aims to prevent the consummation and maintenance of unlawful combinations, it reaches those already formed but which are still maintained and are in the process of consummation.

3. CONSTITUTIONAL LAW — VALIDITY OF ANTI-MONOPOLY ACT — DUTIES IMPOSED UPON JUSTICES OF THE SUPREME 'COURT ARE JUDICIAL.    The Anti Monopoly Act does not impose non-judicial duties upon judicial officers, and its constitutionality cannot be successfully attacked upon that ground.    The duties imposed upon justices of the Supreme Court by the provisions relating to procedure, requiring any such justice upon application by the attorney-general to grant an order for the examination before the justice or a referee appointed by him of a person whose testimony is by the attorney-general deemed material and necessary to prepare his complaint or prepare for trial of an action about to be instituted by him under the act, are judicial in character because they are incidental to a judicial proceeding; they are judicial in form, because, although the language used is mandatory on its face, a justice is not required to grant the order as a matter of course, but must exercise the judicial function of deciding whether the application makes out a case pursuant to the statute and authorizes the order according to its provisions: they are judicial in substance and have a judicial purpose to accomplish, because the object of the act is to "secure testimony" in relation to violations thereof, and while the testimony can only be used by the attorney-general to prepare

his complaint or to prepare for trial, either use is a judicial purpose incidental to a judicial proceeding about to be instituted thereunder and within the power of the legislature to intrust to the Supreme Court or its judges.

4. PERSONAL LIBERTY OF WITNESS NOT INFRINGED UPON WITHOUT DUE PROCESS OF LAW. The act does not infringe upon personal liberty without due process of law, and does not come within the express or implied prohibition of the State or Federal Constitutions. The application therein authorized cannot be made by a private citizen, or a party to a personal controversy, but only by the attorney-general, in behalf of the state, representing all citizens, as a party to an action to be prosecuted for the common welfare; the testimony must be material and necessary, so that there is reasonable protection against danger of abuse; no general inquiry into private affairs is allowed nor general production of books and papers is required; no vested right is interfered with; while the testimony cannot be used as evidence in a judicial proceeding, except as an admission, as against himself, by the witness who gave it, it is to be used in connection with a judicial proceeding in aid of a judicial purpose; due process of law does not require that testimony cannot be taken by a judge unless it is to be read in court provided the sovereign power needs it in order to enforce its own laws through judicial proceedings; and as is shown by the proceeding under review, means of testing the rights of a witness under the statute are afforded by the laws of this state; the courts are open and a motion may be made to protect any of his substantial rights.

5. GENERAL RULE RELATING TO PROCEDURE IN ACTION BY THE STATE TO ENFORCE ITS POLICY AS A POLITICAL COMMUNITY. The state when a litigant, not to establish a mere right of property, but a cause of public justice, is not limited by the Constitution to the procedure that ordinarily prevails in controversies between individuals, but has the power through the legislature to authorize testimony to be taken in order to aid its attorney-general in attempting to enforce its policy as a political community and to promote the general welfare by proceedings in its courts of justice.

6. REFEREE — POWER TO APPOINT. A justice of the Supreme Court may be authorized by the legislature to appoint a referee to take testimony which it could authorize the judge himself to take out of court.

7. APPEAL — ABSTRACT QUESTIONS CANNOT BE CERTIFIED FOR REVIEW. The Appellate Division has no power to certify abstract questions to the Court of Appeals for review, and the latter court has no power to answer such questions, since it is limited to a review of the determination of the Appellate Division.

*Matter of Davies*, 55 App. Div. 245, reversed.

(Argued April 17, 1901; decided October 1, 1901.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the third judicial depart-

ment, entered November 26, 1900, which reversed an order of Special Term denying a motion to vacate and set aside an order directing Charles W. Morse and others to appear and be examined under the provisions of chapter 690 of the Laws of 1899, and vacated such order. Also motion to dismiss the appeal.

An application by the attorney-general for an order to examine witnesses, pursuant to chapter 690 of the Laws of 1899, resulted in an *ex parte* order, made on the 28th day of May, 1900, by a justice of the Supreme Court at chambers appointing a referee and requiring the witnesses named to appear before him for examination. A motion to vacate the same, made at Special Term, was denied by an order which was silent as to the reasons for making it. The order last named was reversed by the Appellate Division and the motion to vacate the order made at chambers was granted, but the order of reversal stated no ground upon which the court proceeded. Subsequently, upon motion of the attorney-general, an appeal was allowed and the following questions were certified by the Appellate Division to have arisen, which, in its opinion, ought to be reviewed by the Court of Appeals :

"*First.* Are the duties which the statute (Chapter 690 of the Laws of 1899) imposes upon the justices of the Supreme Court non-judicial duties, and, if so, is it for that reason unconstitutional and inoperative ?

"*Second.* In granting the order of May 28, 1900, was Justice CHASE performing a judicial function ?

"*Third.* Has the legislature constitutional power to confer upon the referee appointed in the matter provided by such statute the authority to take testimony and punish for contempt in the manner and to the extent therein provided ?

"*Fourth.* Do the facts set forth in the petition of the attorney-general show that any action authorized by section 3 of chapter 690 of the Laws of 1899 could be maintained ?

"*Fifth.* Does chapter 690 of the Laws of 1899 require Charles W. Morse, under the order of Justice CHASE of May

28, 1900, to give evidence of matters which might subject him to penalties or criminal prosecution under any Federal statute in violation of his rights under the State or Federal Constitution ?"

Pursuant to the leave granted by the Appellate Division an appeal was taken to this court, which the respondents now move to dismiss.

*John C. Davies, Attorney-General* [*J. Newton Fiero* and *Henry B. Coman,* of counsel], for appellants. An appeal lies to this court upon the certificate of the Appellate Division. (*People ex rel.* v. *Lord,* 157 N. Y. 408; *People ex rel.* v. *Bd. of Suprs.,* 153 N. Y. 370; *People ex rel.* v. *Comrs., etc.,* 103 N. Y. 370.) This appeal will lie by reason of its being a special proceeding. (*Matter of Attorney-General,* 22 App. Div. 285; 155 N. Y. 441; Code Civ. Pro. § 772; *Jenkins* v. *Putnam,* 106 N. Y. 272; *Fiske* v. *Smith,* 9 App. Div. 208; *Matter of Taxpayers,* 157 N. Y. 78.) The act does not impose other than judicial functions upon a judicial officer, and is not open to the objection that it violates the Constitution of the state. (*People ex rel.* v. *Keeler,* 99 N. Y. 463; Cooley on Const. Law [2d ed.], 51; *Interstate Commerce Com.* v. *Brimson,* 154 U. S. 447; *Matter of Leich,* 31 Misc. Rep. 671; *Matter of Attorney-General,* 155 N. Y. 441; *R. Lamp Co.* v. *Brigham,* 1 App. Div. 490.) The language of the statute in question does not deprive a justice before whom the matter is brought of discretion, nor does the application provided for by reason of such provision lose its character as a judicial proceeding so as to oust the Supreme Court of jurisdiction. (Code Civ. Pro. § 772; *Jenkins* v. *Putnam,* 106 N. Y. 272; *Fiske* v. *Smith,* 9 App. Div. 208; *Matter of Taxpayers,* 157 N. Y. 78.) The legislature did not exceed its power in authorizing the appointment of a referee under the provisions of the act. (*Duryee* v. *Mayor, etc.,* 96 N. Y. 477; *People ex rel.* v. *Kenney,* 96 N. Y. 294; *Lawton* v. *Steele,* 119 N. Y. 226; *People ex rel.* v. *Kelly,* 76 N. Y. 489; *Matter of Vil. of Middletown,* 82 N. Y. 196; *Mat-*

ter of *N. Y. & L. I. B. Co.* v. *Smith,* 148 N. Y. 540 ; *People
ex rel.* v. *Briggs,* 50 N. Y. 553 ; *Gordon* v. *Cornès,* 47 N. Y.
608 ; Cooley on Const. Lim. 176 ; *Town of Fishkill* v. *F. & B.
P. R. Co.,* 22 Barb. 642 ; *People* v. *O'Brien,* 38 N. Y. 193 ;
*Davis* v. *State,* 7 Md. 151.) The petition shows facts under
which an action can be maintained. It is, however, unnecessary
for the purposes of this appeal, to show facts other than that
the attorney-general has determined to commence an action
under the provisions of chapter 690 of the Laws of 1899. (*Arnot*
v. *P. & E. C. Co.,* 68 N. Y. 558 ; *Judd* v. *Harrington,*
139 N. Y. 105 ; *People.* v. *Milk Exchange,* 145 N. Y.
267 ; *People* v. *Sheldon,* 139 N. Y. 251 ; *United States* v. *T.
M. Freight Assn.,* 166 U. S. 290 ; *United States* v. *Joint T.
Assn.,* 171 U. S. 505 ; *A. P. & S. Co.* v. *United States,* 175
U. S. 211 ; *Cummings* v. *U. B. S. Co.,* 164 N. Y. 401 ;
*Cohen* v. *B. & J. E. Co.,* 166 N. Y. 292 ; *People ex rel.* v.
*Lacombe,* 99 N. Y. 49.) The witness cannot raise the ques-
tion of privilege at this stage of the proceeding, since it
appears by his own affidavit that he was neither sworn nor
asked to be sworn. Nor does it appear that the questions to
be put to him would necessarily be privileged. (*Interstate
Commerce Com.* v. *Brimson,* 154 U. S. 447 ; *Kinney* v.
*Roberts & Co.,* 26 Hun, 166 ; *Y. T. Co.* v. *Brown,* 27 Hun,
248 ; *Skinner* v. *Steele,* 88 Hun, 307 ; *Campbell* v. *B. C.
Agency,* 38 App. Div. 137 ; *Osborn* v. *L. D. Co.,* 10 Exch.
698.) The order should not be vacated because of any imag-
inary danger that Morse would be subjected to prosecution
in the Federal courts for violating the act to protect trade
and commerce against unlawful restraint and monopolies.
(*United States* v. *E. C. Knight & Co.,* 156 U. S. 1 ; *A.
P., etc., Co.* v. *United States,* 175 U. S. 211 ; *United States* v.
*Freight Association,* 166 U. S. 290; *Hopkins* v. *United
States,* 171 U. S. 578.) The liability under the Federal stat-
utes is so remote and improbable that it should not be consid-
ered upon this application. (*Brown* v. *Walker,* 161 U. S.
591 ; *Fletcher* v. *Peck,* 9 Cranch, 87 ; *Queen* v. *Boyes,* 1 B.
& S. 311.) The order should not have been reversed as mat-

ter of strict legal right on the part of the attorney-general, even though an application had been made that it be vacated. (*Brown* v. *Walker*, 161 U. S. 591.) The immunity clause contained in section 6 of the statute is ample protection to the witnesses, even though they should be compelled to testify as to matters which would otherwise incriminate them in connection with the illegal combination set forth in the petition. (*People ex rel.* v. *Kelly*, 24 N. Y. 74; *People* v. *Sharp*, 107 N. Y. 427; *People ex rel.* v. *Forbes*, 143 N. Y. 219; *Matter of Attorney-General*, 22 App. Div. 285; *Brown* v. *Walker*, 161 U. S. 591; *Counselman* v. *Hitchcock*, 142 U. S. 547.)

*David Willcox, William Rand, Jr.*, and *Robert G. Scherer* for respondent. The provisions of the act requiring parties to submit to a general inquisition regarding their private affairs are unconstitutional, because they deprive those against whom the proceedings are taken of liberty without due process of law. (*People* v. *Gillson*, 109 N. Y. 389; *Matter of Attorney-General*, 22 App. Div. 285; *People ex rel.* v. *Leubischer*, 34 App. Div. 577; *Boyd* v. *United States*, 116 U. S. 616; *People* v. *Sharp*, 107 N. Y. 427; *United States* v. *Bell*, 81 Fed. Rep. 830; *Ætna Ins. Co.* v. *Mayor, etc.*, 153 N. Y. 331; *Allgeyer* v. *Louisiana*, 165 U. S. 578; *Colon* v. *Lisk*, 153 N. Y. 188; *Wynehamer* v. *People*, 13 N. Y. 378.) The act is unconstitutional because its terms compel the parties examined to give evidence which can be used against them in a criminal case. (*People ex rel.* v. *Forbes*, 143 N. Y. 219; *Counselman* v. *Hitchcock*, 142 U. S. 547; U. S. R. S. § 860; *Kellogg* v. *Sowerby*, 32 Misc. Rep. 327; *Brown* v. *Walker*, 161 U. S. 591; *United States* v. *Bell*, 81 Fed. Rep. 830; *Boyd* v. *United States*, 116 U. S. 616; *A. P. Co.* v. *United States*, 175 U. S. 211; *Duryea, W. & Co.* v. *Rayner*, 11 Misc. Rep. 294; *A. I. Co.* v. *B. T. Co.*, 7 Civ. Pro. Rep. 443; *H. R. K. Co.* v. *Bronner*, 18 Misc. Rep. 627.) The provisions regarding procedure are unconstitutional because they attempt to impose upon the justices of the Supreme

Court non-judicial functions. (*Matter of Attorney-General,* 155 N. Y. 441; Suth. on Stat. Const. § 5; *Murray* v. *Company,* 18 How. [U. S.] 272; *Taylor* v. *Porter & Ford,* 4 Hill, 140; *Wayman* v. *Southard,* 10 Wheat. 46; *Kilbourn* v. *Thompson,* 103 U. S. 168; *People ex rel.* v. *Leubischer,* 34 App. Div. 577; *Dash* v. *Van Kleeck,* 7 Johns. 477; *Wynehamer* v. *People,* 13 N. Y. 378; *People ex rel.* v. *Keeler,* 99 N. Y. 463; *People ex rel.* v. *Howland,* 155 N. Y. 270.) The provisions of the statute conferring power upon the referee are unconstitutional. (*Van Marter* v. *Hotchkiss,* 4 Abb. Ct. App. Dec. 484; *Matter of Stilwell,* 139 N. Y. 337; *Matter of Bohm,* 4 Hun, 558; *Shepard* v. *Eddy,* 2 N. Y. Supp. 534; *People ex rel.* v. *Nichols,* 79 N. Y. 582; *People ex rel.* v. *Mann,* 97 N. Y. 530; *Roberts* v. *State,* 30 App. Div. 106; 160 N. Y. 217; *Phillips* v. *Gorham,* 17 N. Y. 270; *Farmers' Bank* v. *Houston,* 44 Hun, 567; *Doyle* v. *Met. El. Ry. Co.,* 136 N. Y. 505.) The transactions set forth in the petition of the attorney-general consist merely of the organization of a corporation and the purchase and sale of property by it; they are fully authorized by law, although such acquisition of property may prevent competition. (*Heishon* v. *K. L. Ins. Co.,* 77 N. Y. 278; *Balcom* v. *Adams,* 18 N. Y. S. R. 13; *Davidsburgh* v. *K. L. Ins. Co.,* 90 N. Y. 526; *Robinson* v. *Oceanic S. N. Co.,* 112 N. Y. 315; *Matter of Jacobs,* 98 N. Y. 98; *People* v. *Marx,* 99 N. Y. 377; *Forster* v. *Scott,* 136 N. Y. 577; *Colon* v. *Lisk,* 153 N. Y. 188; *Durfee* v. *Pomeroy,* 154 N. Y. 583; *N. Y. S. U. S. Co.* v. *Department Public Health,* 32 Misc. Rep. 577.) The petition shows affirmatively that the order is unwarranted by the statute. (*Bronk* v. *Barckley,* 13 App. Div. 72; *People* v. *O'Brien,* 111 N. Y. 1; *Walker* v. *Walker,* 155 N. Y. 77; *Auffmordt* v. *Rasin,* 102 U. S. 620; *People* v. *Hawker,* 152 N. Y. 234; *Erie R. R. Co.* v. *Penn.,* 153 U. S. 628; *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Addystone Pipe & Steel Co.* v. *U. S.,* 175 U. S. 211; *People* v. *Hawkins,* 20 App. Div. 494; 157 N. Y. 1; *U. S. Vinegar Co.* v. *Schlegel,* 143 N. Y. 537.)

VANN, J. In support of the motion to dismiss the appeal it is urged that, so far as the record discloses, the order of reversal may have been made in the exercise of discretion, and, hence, that it is not reviewable in this court. (*Matter of Attorney-General*, 155 N. Y. 441, 445.) We think, however, that the motion to dismiss should be denied for the reason that where the Appellate Division allows an appeal and certifies a question of law for us to review, the presumption is that its determination was made upon the merits, unless it expressly appears by the record that it was made in the exercise of discretion.

The statute which gives rise to this controversy is entitled " An Act to prevent monopolies in articles or commodities of common use, and to prohibit restraints of trade and commerce, providing penalties for violations of the provisions of this act, and procedure to enable the attorney-general to secure testimony in relation thereto." (L. 1899, ch. 690.) It is a continuation, with some changes, of a similar act with the same title passed in 1897, which was the subject of consideration in *Matter of the Attorney-General* (32 Misc. Rep. 1 ; 22 App. Div. 285 ; 155 N. Y. 441 ; L. 1897, ch. 383). The act now in force declares every contract or combination to be against public policy, illegal and void whereby a monopoly in this state of any commodity in common use is or may be created, established or maintained, or whereby competition in this state in the supply or price of any such commodity is or may be restrained or prevented, or whereby, in order to create or maintain a monopoly within this state, the free pursuit in this state of any lawful business is or may be restricted or prevented. (§ 1.)

It provides for the punishment of every person or corporation who shall make or attempt to make any such contract or combination, or do any act pursuant thereto, " or in, toward or for the consummation thereof." (§ 2.)

It authorizes the attorney-general to bring an action in the name of the People against any corporation, foreign or domestic, its officers or agents, or against any person, " to restrain and

prevent the doing in this state of any act herein declared to be illegal, or any act, in, toward or for the making or consummation" of any prohibited contract or combination, wherever the same may have been made.   (§ 3.)

It declares that "whenever the attorney-general has determined to commence an action" under the act, before beginning the same he may present to any justice of the Supreme Court an application in writing for an order directing the persons mentioned therein to appear before such justice "or a referee designated in such order, and answer such questions as may be put to them  *  *  *  and produce such papers, documents and books concerning any alleged illegal contract" or combination in violation of the act.   Said application "may simply show upon" the "information and belief" of the attorney-general "that the testimony of such person or persons is material and necessary."   It is made the duty of the justice to grant the application, with such preliminary injunction as may appear to him to be proper and expedient, and of the witness to attend at the time and place designated.   "The testimony of each witness must be subscribed by him, and all must be filed in the office of the clerk of the county in which such order for examination is filed."   The provisions of the Code of Civil Procedure relating to the examination of witnesses before the commencement of an action "shall not apply except as herein prescribed."   (§ 4.)

The order must be signed by the justice making it and the attorney-general may indorse upon the same "a clause requiring such person to produce on such examination all books, papers and documents in his possession, or under his control, relating to the subject of such examination."   (§ 5.)

No person is "excused from answering any questions  *  *  *  or from producing any books," because the evidence, documentary or otherwise, may tend to incriminate him, but he is protected from criminal prosecution and from any penalty or forfeiture "on account of any transaction, matter or thing concerning which he may testify, or produce" documentary evidence.   (§ 6.)

7

The referee so appointed is given " all the powers and is subject to all the duties of a referee appointed under section 1018 of the Code of Civil Procedure, so far as practicable, and may punish for contempt a witness duly served as prescribed in this act for non-attendance or refusal to be sworn or to testify, or to produce books," documents, etc., " in the same manner, and to the same extent as a referee appointed to hear, try and determine an issue of fact or of law." (§ 7.)

Pursuant to this act the attorney-general presented to a justice of the Supreme Court, at chambers, his petition, verified upon information and belief, in which he stated that " as such officer " he had determined to commence an action under said statute, in the name of the People, against the American Ice Company, a foreign corporation engaged in business in the state of New York, and against its officers and directors, to restrain them "from doing in this State any act in, toward or for the making or consummation of " a certain contract or combination " and from doing business in the state of New York, and to vacate, annul and set aside the certificate procured from the Secretary of State, pursuant to section 15 of the General Corporation Law, authorizing said company to do business in the state of New York." He further alleged that the two available sources for the supply of ice to the inhabitants of the city of New York are the Hudson river valley and the Kennebec and Penobscot rivers in the state of Maine; that prior to March 11, 1899, more than eighty per cent of the ice available from said sources was owned or controlled by two corporations organized under the laws of that state, known as the Knickerbocker Ice Company and the Consolidated Ice Company ; that the latter, prior to said date, controlled about 90 per cent of the wholesale and retail ice business in the city of New York, and the former about 80 per cent in the cities of Philadelphia, Baltimore and Washington; that these two corporations had a virtual monopoly of the ice supply available to the inhabitants of the city of New York, and, acting together, had it in their power to arbitrarily fix the price of ice; that prior to said date they agreed to combine their inter-

ests, and thus control by one company and one management the entire ice-producing territory for the purpose of creating a monopoly of the ice business in various cities, and particularly in the city of New York; that on the 11th of March, 1899, pursuant to such agreement, a third corporation, known as the American Ice Company, was organized under the laws of the state of New Jersey, with an authorized capital of $60,000,000, and immediately thereafter it acquired title to more than 90 per cent of the total capital stock of the two Maine companies, under an arrangement whereby shares of the American Ice Company, although without any value and representing no property, were exchanged share for share for the stock of those two companies, thus vesting in the board of directors of the New Jersey company the control of the Maine companies, and thereby effecting a monopoly in the supply of ice to the inhabitants of the city of New York, and destroying competition in the production, supply and sale of ice therein; that although the capital stock of each said constituent companies amounted to only $10,000,000, and the actual value of the property of each did not exceed $3,500,000, still the American Ice Company issued its stock to the amount of $20,000,000 in exchange for their stock, and subsequently about $15,000,000 more to acquire the properties of possible competitors on a similar basis, and then caused the whole $35,000,000 to be listed upon the New York Stock Exchange; that thereafter, and as a direct result of this combination, the American Ice Company raised the price of ice in the city of New York 100 per cent over the prices prevailing during the two preceding years, with no reason therefor except to provide means for paying dividends upon its "enormous capitalization, * * * issued without value, as aforesaid."

After making these allegations the petitioner set forth the names of twenty-eight persons and alleged that the testimony of each was "material and necessary to the establishment of the unlawful agreement, arrangement or combination, whereby the above-described monopoly in the sale of ice was created and established and has been maintained." The remaining

allegations of the petition show the relations of some of the proposed witnesses to the American Ice Company, the opportunity of others for knowing about the combination, and of others still for knowing about other companies in the city of New York whose business had been absorbed by the constituent companies and through them by the American Ice Company. It is also alleged that the principal office of the American Ice Company is located in the city of New York, and the source of the petitioner's knowledge and the grounds of his belief as to the truth of the allegations of the petition are briefly stated. The relief asked is that an order be made directing the persons named to appear before a referee " and answer such questions as may be put to them or any of them, and produce all papers, documents and books concerning the aforesaid illegal arrangement, agreement or combination."

Upon the presentation of this petition the justice made an order requiring Charles W. Morse, who is president of the American Ice Company, and the other persons named, to appear before a referee for the purpose of the examination provided for by the act. Mr. Morse was also directed to produce " all contracts and agreements of the American Ice Company with " twelve other ice companies as well as certain other contracts relating to the purchase of ice and the plants, business and good will of ice dealers in the city of New York. He moved to vacate the order, and thus the questions arose that we are called upon to review.

It is insisted, preliminarily, that as the combination had been formed before this proceeding was commenced, and even before the statute was passed, the attorney-general is too late and can accomplish nothing. We cannot sustain this contention. The act is a substantial re-enactment of an earlier statute, and, according to the Statutory Construction Law, must be construed as a continuation thereof. (L. 1892, ch. 677, §§ 31, 32; L. 1897, ch. 383.) As it aims to prevent the consummation and *maintenance* of unlawful combinations, it reaches those already formed but which are still maintained and are in the process of consummation. Any other con-

struction would violate the spirit of the act, as it would render it practically useless by allowing an unlawful agreement, made in secret, to be carried into effect, simply because the attorney-general did not discover that it was in contemplation in time to procure an injunction to prevent its execution.

The general purpose of the act is expressed in its first section. Its object is to destroy monopolies in the manufacture, production and sale in this state of commodities in common use, to prevent combinations in restraint of competition in the supply or price of such commodities, or in restraint of the free pursuit of any lawful business, trade or occupation. The act in this respect is little more than a codification of the common law upon the subject, and its validity, to this extent, is not and cannot be successfully questioned in view of a long line of authorities. (*Cohen* v. *Berlin & Jones Envelope Co.*, 166 N. Y. 292; *Cummings* v. *Union Blue Stone Co.*, 164 N. Y. 401; *People* v. *Milk Exchange*, 145 N. Y. 267; *Judd* v. *Harrington*, 139 N. Y. 105; *People* v. *Sheldon*, 139 N. Y. 251; *Leonard* v. *Poole*, 114 N. Y. 371; *Arnot* v. *Pittston & Elmira Coal Co.*, 68 N. Y. 558; *Stanton* v. *Allen*, 5 Den. 434; *Hooker & Woodward* v. *Vandewater*, 4 Den. 349; *People* v. *Fisher*, 14 Wend. 9; *People* v. *Trequier*, 1 Wheeler Cr. Cas. 142; *U. S.* v. *Joint Traffic Assn.*, 171 U. S. 505; *U. S.* v. *Freight Assn.*, 166 U. S. 290; *The King* v. *Journeymen Taylors of Cambridge*, 8 Mod. 11.)

The validity of the procedure authorized by the act, however, is challenged as in violation of both the State and Federal Constitutions. The first and second questions certified involve the proposition that the statute imposes other than judicial duties upon a judicial officer and that for this reason the provisions relating to the procedure are unconstitutional and void.

Free government consists of three departments, each with distinct and independent powers, designed to operate as a check upon those of the other two co-ordinate branches. The legislative department makes the laws, while the executive executes and the judiciary construes and applies them. Each depart-

ment is confined to its own functions and can neither encroach upon nor be made subordinate to those of another without violating the fundamental principle of a republican form of government. As this is conceded by the counsel upon either side, discussion is unnecessary, but the following authorities are cited for the convenience of those who desire to investigate the subject. (*Matter of Steinway*, 159 N. Y. 250; *People ex rel. Broderick* v. *Morton*, 156 N. Y. 136, 144; *People ex rel. Burby* v. *Howland*, 155 N. Y. 270, 282; *People ex rel. McDonald* v. *Keeler*, 99 N. Y. 463, 480; *Wynehamer* v. *People*, 13 N. Y. 378, 391; *Dash* v. *Van Kleeck*, 7 Johns. 477, 487; *Taylor* v. *Porter & Ford*, 4 Hill, 140, 147; *Wayman* v. *Southard*, 10 Wheat. 1, 46; *Murray's Lessees* v. *H. L. & I. Co.*, 18 How. [U. S.] 272, 280; *Kilbourn* v. *Thompson*, 103 U. S. 168, 190; Cooley's Prin. of Constn. Law [2d ed.], 51; 6 Am. & Eng. Encycl. [2d ed.] 1060.)

While the performance of administrative duties cannot be imposed by the legislature upon the Supreme Court, as such, except as to matters incidental to the exercise of judicial powers, yet for many years, and without serious question, acts have been passed conferring upon the justices of that court authority, out of term, to perform a variety of functions, administrative or semi-administrative in character, such as the approval of certificates of incorporation, the acknowledgment of conveyances, the solemnization of marriages, the appointment of commissioners of jurors, the investigation of the financial affairs of villages and the like. (2 R. S. 756, § 4; L. 1847, ch. 319, § 1; L. 1892, ch. 682, § 64; L. 1892, ch. 685; L. 1897, ch. 194; L. 1897, ch. 430.) A distinction seems to prevail in practice between powers conferred upon a court and those conferred upon the judges thereof.

The duties of the justice to whom application was made for the order in question were judicial in form. He was not required to grant it as a matter of course, although the language used is mandatory upon its face, as it was in *Jenkins* v. *Putnam* (106 N. Y. 272), yet we declared that "while it is said in section 873 (Code Civ. Pro.) that the judge 'must'

grant an order when an affidavit conforming to the require-
ments of the previous section is presented to him, yet we do
not think that the language is absolutely mandatory and that
it was intended to deprive the judge of all discretion.    *    *    *
Where the judge can see that the examination is sought merely
for annoyance or for delay, and that it is not in fact necessary
and material, he ought not to be required, and cannot absolutely
be required, to make the order."

The expressions in the statute, "it shall be the duty of the
justice    *    *    *    to grant such application " and " the order
shall be granted by the justice," do not deprive him of the
power to decide whether upon the facts alleged the order
should be granted.    It was his duty to consider the allega-
tions of the petition and decide whether they made out a
case pursuant to the statute and authorized an order of exam-
ination according to its provisions.    It was necessary for him
to be satisfied judicially that the attorney-general had, in good
faith, determined to commence an action and whether the
testimony of the persons named was material and necessary in
connection with that action.    The statute is not satisfied by a
simple statement of the attorney-general in his petition that
he is informed and believes that the testimony of such per-
sons is material and necessary, but he must show how and
why it is material and necessary.    This involves the general
nature and object of the action that he has determined to
bring.    A determination to bring an action, indefinite and
undefined, is not what the legislature contemplated, but one,
the general character of which is described sufficiently to
show that it is founded upon the statute as well as upon
probable cause, and that the testimony of the witnesses will be
material and necessary therein.    Thus the justice is called
upon to exercise the judicial function of deciding whether the
application conforms to the statute as thus construed, the same
as is required of him when an application is made for an order
of arrest, a warrant of attachment or any other provisional
remedy.    His duty is not merely clerical but requires the
exercise of judgment.    When a writ of habeas corpus is

applied for, the statute says that the judge "must grant it
without delay," and even inflicts a penalty for failure to com-
ply with the command, yet it is his duty to refuse the writ
unless the facts required by the Code are sufficiently set forth.
(Code Civ. Pro. § 2020.)   In all these cases the judge is
required to act judicially, for he must decide the question of
law whether the facts alleged make out a case under the
statute.

But while the power committed to the justice is judicial in
form, unless it is judicial in substance and has a judicial pur-
pose to accomplish, the duty is of an administrative character
only.   Since the object of the statute, so far as it relates to
procedure, is not expressly stated, it must be inferred from
the title and the provisions of the act.   The title declares that
the object of the procedure is to enable the attorney-general
to "secure testimony" in relation to violations of the act and
the text indicates the same purpose.   The statute is remedial
and it is the duty of courts to so construe it as to "suppress
the mischief and advance the remedy."   As no notice to the
proposed adverse party is required and no opportunity is
expressly afforded for cross-examination, the testimony cannot
be read in evidence upon the trial of the action.   The taking
of testimony for use upon a trial is part of the trial itself, so
far as the constitutional provision allowing the right to coun-
sel and requiring due process of law is concerned.   No judg-
ment can be pronounced or determination made, based wholly
or in part upon such testimony, which is not reported to the
judge or court for judicial action.

The only use, so far as we can now see, that can be made of
the testimony is to enable the attorney-general either to pre-
pare his complaint or prepare for trial.   The former is a judi-
cial purpose and is clearly within the power of the legisla-
ture to intrust to the court, or its judges.   (*Glenney* v. *Sted-
well*, 64 N. Y. 120.)   It aids directly in framing the issues
which the court is to try; tends to prevent the delay resulting
from amendments of the complaint, and thus advances the
remedy to the end which is to be effected by the judgment.

(*Matter of Cooper*, 22 N. Y. 67, 84.) The other use suggested involves a serious question. It is urged that an inquisition into one's private affairs, the compulsory production of his books and papers and the disclosure of his business secrets, is an invasion of personal liberty as guaranteed by the Constitution. It is insisted that a proceeding which ends in nothing, that establishes no right and prevents no wrong, either directly or indirectly, is not of a judicial nature.

As the legislature has all the power of legislation there is, it can authorize the state, through its judges and attorney-general, to take testimony in order to enforce its own laws, unless the Constitution forbids it. The provision of the fundamental law relied upon to prevent such legislation is that no person shall " be deprived of life, liberty or property without due process of law." (Art. 1, § 6.) The word "liberty," as thus used, has a broad meaning. It includes liberty of action, which is interfered with by a command to lay aside all business and excuses and appear at a designated place and give testimony. It embraces the right to keep secret one's books and papers, his business methods and his knowledge of his own affairs. Yet these constitutional rights may all be interfered with by due process of law when the general good requires it. By due course of law qualifications and limitations may be imposed and the natural rights of the citizen somewhat abridged, without infringing upon constitutional liberty. (*Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447; Cooley's Lim. 414.) Organized society requires some sacrifice of personal liberty by its members, and the Constitution which organized the state government makes liberty subject to due process of law. The ultimate question, therefore, is whether it is due process of law for the state, through its judicial department, to examine a witness in order to see whether his testimony is material and necessary in a judicial proceeding about to be instituted.

Through its legislative department the state can examine witnesses with reference to prospective legislation, and why can it not, through its judicial department, under an appropri-

ate statute, examine witnesses in order to establish in court rights belonging to all its citizens, even if the testimony is not to be read in court, but is to be used for a purpose incidental to the trial? A witness, when subpœnaed in a private lawsuit, is compelled to leave his home, his usual avocation, and at his peril to appear at the time and place named for the purpose of giving testimony. He may even be required to produce his books and disclose the secrets of his business. He has no discretion about it. The law imposes this obligation upon him in order that justice may be done. It is a sacrifice that he must make for the benefit of the whole community, the same as he must give up part of his property through the payment of taxes for the like purpose. The application authorized by the statute under consideration cannot be made by a private citizen, or by a party to a personal controversy, but only by the attorney-general, in behalf of the state, representing all citizens, as a party to an action to be prosecuted for the common welfare. It must be made by the law officer of the state, acting upon the responsibility of his office, and the testimony must be material and necessary, so that there is reasonable protection against danger of abuse. No general inquiry into private affairs is allowed, nor general production of books and papers is required. No vested right is interfered with. While the testimony cannot be used as evidence in a judicial proceeding, except as an admission, as against himself, by the witness who gave it, it is to be used in connection with a judicial proceeding in aid of a judicial purpose. The procedure authorized is in the nature of a statutory bill of discovery. The ancient remedy of enforcing discovery was devised by the courts to compel a party in a pending action at law to discover and set forth upon oath in an independent action every fact and circumstance within his knowledge, information or belief material to the plaintiff's case. (2 Story's Eq. Jur. [13th ed.] 811 ; Adams Equity [8th ed.], 1.) A bill of discovery was never brought to a hearing and there could be no decree on matters set forth therein, for its sole object was to obtain testimony for use in another action. (6 Encycl. Pl.

& Pr. 781.) It would lie even if the other action had not been brought, provided there was an intention to bring it. (*Stebbins* v. *Cowles*, 10 Conn. 408.) The process of thus obtaining testimony has never been regarded as an unauthorized interference with personal liberty but as due process of law. If the courts themselves, simply of their own motion, can establish such a system, cannot the legislature create a procedure similar in nature, even if it is more drastic in effect?

It is true that testimony thus taken could be read in evidence upon the trial of the other action, but is this essential to a judicial purpose, or does due process of law require that testimony cannot be taken by a judge, unless it is to be read in court, provided the sovereign power needs it in order to enforce its own laws through judicial proceedings? Is the state itself, when a litigant, not to establish a mere right of property, but a cause of public justice, limited by its own Constitution to the procedure that ordinarily prevails in controversies between individuals, or has it the power through its legislature to authorize testimony to be taken in order to aid its attorney-general in attempting to enforce its policy as a political community and to promote the general welfare by proceedings in its courts of justice? Is there no power in government to examine a witness for this purpose? The question is not whether the exercise of the power is wise or discreet, but whether the power exists. We are not called upon to decide whether the thing should be done, but whether it can be done, and care should be taken in making the decision not to hamper the state in the enforcement of law. "A method of procedure having the sanction of settled usage is commonly regarded as due process of law." (*People* v. *Adirondack Ry. Co.*, 160 N. Y. 225, 236; *Wynehamer* v. *People*, 13 N. Y. 395; *Westervelt* v. *Gregg*, 12 N. Y. 202, 209; *Murray's Lessees* v. *Hoboken Land & Improvement Co.*, 18 How. [U. S.] 272.) Aside from the bill of discovery established by the courts, formerly in force, there is the statutory right to discover property through proceedings supplementary to execution, created by the legislature. (Code Civ. Pro.

§§ 2432–2471; Code Pro. § 292.)   The power of the legisla-
ture to thus subject a citizen to a searching examination in
relation to his property, books and papers, is sanctioned by
long usage, with the approval of the courts, the bar and the
public.   It is not challenged as non-judicial in character, or
as in violation of due process of law.   So a party, or a pro-
spective party, may be examined out of court and depositions
of witnesses may be taken within or without the state for use
in courts of justice within or without the state.   (Code Civ.
Pro. §§ 870–920.)   A deposition may be taken before an action
is brought provided one is " about to be brought."   (*Mer-
chants' National Bank* v. *Sheehan,* 101 N. Y. 176.)   Even a
physical examination, without regard to the sex of the subject,
may be ordered by a justice of the Supreme Court to be made
by one or more surgeons or physicians, to be designated by
him.   (L. 1893, ch. 721; Code Civ. Pro. § 873.)   While this is
done in connection with the examination of the plaintiff as a
witness before trial, the effect is simply to qualify the physi-
cians to testify upon the trial, for no testimony is taken or
record made by them as to what they saw or discovered,
which, of itself, can be used as evidence.   Thus the purpose
of the physical examination made by them is merely inciden-
tal to the trial, as an aid to the court in administering justice
by enabling them to examine the body of the party before
the trial so as to swear to what they saw, upon the trial.   Yet
we have held that this legislation does not violate any of the
express or implied restraints upon legislative power to be
found in the Federal or State Constitutions.   (*Lyon* v. *Man-
hattan Ry. Co.*, 142 N. Y. 298, 302.)

An act of Congress, authorizing the Circuit Courts of the
United States to use their process in aid of inquiries before
the interstate commerce commission, has been held not to
conflict with the Federal Constitution nor to impose non-judi-
cial duties upon judicial tribunals.   (*Interstate Commerce
Commission* v. *Brimson*, 154 U. S. 447.)   In that case the
subject is treated in a masterly manner and the main authori-
ties relied upon by the respondents, which are from Federal

sources, are examined and distinguished. The interstate commerce commission was authorized by acts of Congress to inquire into the management of the business of all common carriers and for that purpose " to require by subpœna the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements and documents relating to any matter under investigation." If any person refused to obey a subpœna or was guilty of contumacy, the Circuit Courts of the United States were authorized to issue an order requiring such person to appear before the commission, produce books and papers and give evidence touching the matter in question and to punish any failure to obey such order as a contempt of court. The testimony taken by the commission was for its own use only. It could not be used in any court or judicial proceeding, although the report of the commission was made *prima facie* evidence, if an application was made to enforce its recommendations. (U. S. Statutes 1887, ch. 104; 1889, ch. 382; 1891, ch. 128.) The proceeding in court was in aid of executive action, yet the act was held to be constitutional and the duties of the Circuit Courts judicial in their nature. The principle of that case goes farther than is necessary in order to sustain the statute and the proceedings thereunder in this case. Substantially the same means of testing the rights of a witness under the act of Congress are afforded by the laws of this state in connection with the statute under consideration, as is shown by the proceeding we are now reviewing. The courts are open and a motion may be made, as the one before us was made, to protect any substantial right of a witness.

We think the duties imposed by chapter 690 of the Laws of 1899 upon justices of the Supreme Court are of a judicial character, because they are incidental to a judicial proceeding; that said statute does not infringe upon personal liberty without due process of law and does not come within the express or implied prohibition of the State or Federal Constitutions. The first question certified should, therefore, be answered in the negative and the second in the affirmative.

The. third question consists of two parts, the first relating to the power of the legislature to confer upon the referee appointed under the statute authority to take testimony, and the second, to his power to punish a contumacious witness for contempt. The latter part of the question is as yet abstract, and the court below had no power to certify it to us, and we have no power to answer it. (*Grannan* v. *Westchester Racing Assn.*, 153 N. Y. 449.) We can only review the determination of the Appellate Division, and that court has not determined, and could not determine, whether the referee has power to punish a witness for contempt, because he has not attempted to exercise that power and may never be called upon to exercise it.

That a justice of the Supreme Court may be authorized by the legislature to appoint a referee to take testimony, which it could authorize him to take himself out of court, seems hardly open to discussion. Divers statutes for many years have empowered a judge at chambers to appoint a referee to take testimony for various purposes, and the right to do so has not hitherto been seriously challenged. (2 R. S. 391, § 3; L. 1847, ch. 280, §§ 77–79; Code Pro. § 401; Code Civ. Pro. §§ 873–879.) It is a matter of convenience in procedure, designed to expedite business and save the time of high judicial officers for more important purposes. The subject is under the control of the legislature, for there is no constitutional prohibition, express or implied. We think the power existed to authorize the appointment of a referee, and the first part of the third question should, therefore, be answered in the affirmative and the last part not answered at all.

The fourth and fifth questions are as yet abstract, and we have no power to answer them.

The order of the Appellate Division should be reversed and that of the Special Term affirmed, with costs, and the questions certified answered as indicated in the opinion.

BARTLETT, J. (dissenting). I dissent on the ground that a witness in this proceeding is deprived of his liberty without

due process of law in violation of the Federal and State Constitutions.

Physical restraint is not essential to constitute, in law, the act which deprives the citizen of his liberty. The Constitution equally prohibits the interference, without due process of law, with the right of privacy, the right to keep from the general public business methods and secrets, the right to the custody of books, papers and correspondence and the general right to shut out the world from private affairs.

The procedure authorized by the act under consideration does not, in my opinion, constitute due process of law. The general purposes of the act are praiseworthy, but the legislature, in seeking to restrain monopolies, must not invade the constitutional rights of the citizen. The object of the act before us is, in brief, to prevent monopolies, to inflict penalties and to enable the attorney-general to "secure testimony." As the act deals with penalties it must be strictly construed.

It is only necessary for the attorney-general to state that "he has determined to commence an action or proceeding" under the act, and to "simply show upon his information and belief that the testimony of such person is material and necessary," to entitle him to an order for the examination of any witness or witnesses he may think proper to name, and for the production of such books, papers, etc., as he may indicate. This act, in terms, provides that the provisions of the Code of Civil Procedure relating to the application for an order for the examination of parties, or proposed parties, and witnesses before the commencement of an action, and the method of proceeding on such examination, shall not apply. (Code of Civ. Pro. §§ 870 *et seq.*) This is a striking feature, as it discloses the legislative intention to allow parties proceeding under the act to prosecute an examination untrammeled by the wise restraints imposed upon private litigants.

I am of opinion that the Code of Civil Procedure furnishes an ample remedy to the attorney-general in the premises.

The act and the papers upon which the attorney-general moves disclose that this proceeding is not for the purpose of

framing a complaint, or preserving the expected testimony, but is "to secure testimony," as is declared in the title of the act.

It is very clear to my mind that the ommissions from the act of 1899, of certain provisions contained in the act of 1897, indicate the legislative intention to authorize the attorney-general to make a general investigation, an unlimited examination, in seach of evidence.

The legislature, even clothed as it is with great and undefined powers, cannot authorize such a general investigation. It is prevented by those constitutional barriers which stand between the liberty of the citizen and the tyranny of arbitrary legislative power. It has been well said that the protection of this right " is the very essence of constitutional liberty and security." (*Boyd* v. *United States*, 116 U. S. 616.)

The act of 1899 subjects the citizen to an *ex parte* examination, without the aid of counsel, in a proceeding which may result in the attorney-general bringing an action in which he may be named as a party defendant; he is compelled to answer such questions as may be put to him, whether they incriminate him or not; he is required to produce such papers, documents and books as the attorney-general indicates, whether they contain incriminating evidence or not; he is forced to sign and swear to a deposition that lacks the quality of evidence and is not to be read in the contemplated action or any pending case.

I have referred to this proceeding as a general investigation, an unlimited examination, but it may well be styled a "fishing expedition."

Under the old equity practice a bill of discovery that sought an examination along the lines of the act of 1899 would have been dismissed as a "fishing bill." (Story's Equity Pleadings, § 325, and cases cited.)

The provisions of the Code, excluded by the act of 1899, are a substitute for the old bill of discovery. I am unable to see any analogy between the examination under the act of 1899 and the compulsory examination of a witness at a trial,

or of a debtor in proceedings supplementary to the execution. To my mind the distinction is self-evident and can be made no plainer by argument.

I find nothing in the cited case of *Interstate Commerce Commission* v. *Brimson* (154 U. S. 447) that supports such legislation as the act of 1899. A reference to the Interstate Commerce Law and the case above cited will show that the latter is clearly distinguishable from the proceedings at bar.

The Constitution of the United States confers upon Congress the power to regulate commerce among the several states. Carriers engaged in interstate commerce, having in many instances been guilty of unjust charges, discriminations or preferences in respect to property, or persons transported from one state to another, Congress, in the exercise of its constitutional power passed chapter 104, U. S. Statutes, 1887, entitled, " An act to regulate commerce." This act was amended by chapter 382, 1889; chapter 128, 1891.

This act of 1887, as so amended, provided at length certain rules and regulations as to the conduct and procedure of common carriers, calculated to remedy the evils to which reference has been made.

It also created the Interstate Commerce Commission, composed of five commissioners.

The commission was given authority to inquire into the management of the business of all common carriers subject to the provisions of the act and to require by subpœna the attendance and testimony of witnesses and the production of all books, papers, etc., *relating to any matter under investigation.*

The act further provided that in case of disobedience to a subpœna, the commission, or any party to a proceeding before it, might invoke the aid of any Circuit Court of the United States in requiring the attendance and testimony of witnesses and the production of books, papers, etc. The act also contained provisions for the framing of issues by complaint and answer to be tried by the commission. Also for the taking of depositions in any proceeding " depending before the com-

mission    *   *   *    at any time after a cause or proceeding is at issue on *petition and answer*."

There are provisions for findings of fact, conclusions and final order; the findings are made "*prima facie* evidence as to each and every fact found."

In case any common carrier neglects to obey the final order of the commission, the United States Circuit Court on petition of the commission, or person interested, is required on short notice to " proceed to hear and determine the matter speedily as a court of equity, and *without the formal pleadings and proceedings applicable to ordinary suits in equity*, but in such manner as to do justice in the premises."

In the case cited, the commission sought to compel the attendance and testimony of certain witnesses who had refused to testify by invoking the provision of the Interstate Commerce Act authorizing the Circuit Court of the United States to order witnesses to appear and testify and produce books, papers, etc.

The persons proceeded against insisted that this provision was repugnant to the Constitution of the United States as imposing on judicial tribunals duties not judicial in their nature.

The court, in holding that the duties imposed were judicial, stated that the fundamental inquiry on the appeal was " whether the present proceeding is a ' case ' or ' controversy ' within the meaning of the Constitution and the statutes conferring jurisdiction upon the United States Circuit Courts."

The court, after citing a number of authorities, uses this language (p. 475): " So, in *Smith* v. *Adams* (130 U. S. 173), Mr. Justice FIELD, speaking for the court, said that the terms ' cases ' and ' controversies ' in the Constitution embraced ' the claims or contentions of litigants brought before the courts for adjudication *by regular proceedings* established for the protection or enforcement of rights, or the prevention, redress or punishment of wrongs.' Testing the present proceeding by these principles, we are of opinion that it is one that can properly be brought under judicial cognizance."

The court further said (page 476) that it was the duty of every citizen to appear and testify and produce books, papers, etc., "if the testimony sought and the books, papers, etc., called for *relate to the matter under investigation*," etc.

The court (at page 478) thus alludes to the fact that these witnesses were called to testify in a judicial proceeding *where issues had been framed:*

"* * * Why is not this proceeding judicial in form and instituted for the determination of distinct issues between the parties, as defined by *formal pleadings*, a case or controversy for judicial cognizance within the meaning of the Constitution? * * * *As the issues are so presented*, as the judicial power is capable of acting on them finally, as between the parties before the court, we cannot adjudge that the mode prescribed for enforcing the lawful orders of the Interstate Commission is not calculated to attain the object for which Congress was given power to regulate interstate commerce."

It thus appears that the Interstate Commerce Commission is a judicial body authorized to try issues, framed under formal pleadings, and make findings of fact and conclusions; that its subpœnas and final order are enforced by the Circuit Court of the United States; the final order by a judgment rendered in a most summary mode of procedure on the issues framed in the commission.

It is apparent from a careful study of the able and elaborate opinion of Mr. Justice HARLAN, that the Supreme Court of the United States compelled these witnesses to testify and produce books, papers, etc., for the reason that the commission is a body engaged in the judicial work of trying issues framed under formal pleadings, and that the testimony and the books, papers, etc., related to the matter thus under investigation.

These witnesses were not called upon to sign and swear to depositions in an *ex parte* examination, having no quality of evidence and not to be read in any judicial proceeding, but they were required to testify in a pending judicial inquiry which would result in a final order setting in motion the summary powers of the United States Circuit Court under the

Interstate Commerce Act.   The case cited lacks, in my judgment, every essential feature of the legislation and proceedings now under consideration.

The prevailing opinion very fairly and clearly states the important question in this case as follows : " Is the state itself, when a litigant, not to establish a mere right of property, but a cause of public justice, limited by its own constitution to the procedure that ordinarily prevails in controversies between individuals, or has it the power through its legislature to authorize testimony to be taken in order to aid its attorney-general in attempting to enforce its policy as a political community and to promote the general welfare by proceedings in its courts of justice ? "

The prevailing opinion holds that the state has this power.

To accord this right to the state, through its legislature, is to permit it to override the Constitution, to place in jeopardy the liberty of the citizen, to subject him to general and unlimited examinations, and the inspection of books, papers, etc., unknown to the common law or our modern procedure.

The beaten paths are best and the eliciting of facts according to the course of practice in courts of law and equity is safe and affords an ample remedy to the state as well as to the citizen.

The interests involved in this litigation are, comparatively speaking, of little importance, but the general principle now sought to be established is in its effects far-reaching and portentous.

I vote for affirmance.

PARKER, Ch. J., MARTIN, LANDON and CULLEN, JJ., concur with VANN, J.; O'BRIEN, J., concurs with BARTLETT, J.

Ordered accordingly.