Cooke, J.
(dissenting in part). I respectfully dissent.
The power and position of the Governor of the State of New York should not be thwarted by a declaration that his order is unconstitutional and invalid — either as a matter of law or State policy. Executive power of the State is vested constitutionally in the Governor and by statute he is authorized at any time to examine and investigate the management and affairs of any department, board, bureau or commission of the State. The Governor was empowered within this framework, therefore, to issue the order requiring applicable officers and employees of the State to file financial statements, the exercise of this power being consistent with and in implementation of the State code of ethics. Far from nullifying and completely counteracting the force and effectiveness of the code of ethics, the order in this respect would implement its provisions and thus breathe life into the legislative scheme. *168 When acting in the exercise of his executive powers, as in this respect, the Governor of the State should be immune from judicial interference (Gaynor v Rockefeller, 21 AD2d 92, 98, affd 15 NY2d 120).
As a matter of law, as head of the executive department, the Governor is authorized to regulate the activities of those officers and employees functioning wholly within that department. From the standpoint of policy alone, it would be anomalous indeed to hold the Governor responsible for the faithful execution of the laws, if at the same time he is refused control over the human agencies whom he must necessarily employ for that purpose.
Executive Order No. 10.1 represents an attempt by the Governor to provide a framework pursuant to which he might ascertain whether certain State officers and employees (hereafter referred to as "employees”) are abiding by high ethical standards required of them in the performance of their duties. That order, to the extent that it is grounded on powers conferred expressly or by necessary implication either by the Constitution or by statute, thereby voicing the will of the people or the Legislature, should be upheld and enforced.
Briefly, Executive Order No. 10.1 (9 NYCRR 3.10) establishes rules and regulations with respect to conflicts of interest and ethical standards for certain high-level State employees to be administered, but not enforced, by the Board of Public Disclosure (Board). A broad prophylactic device, the order: requires covered employees to file a detailed financial disclosure statement with the Board; prohibits these employees from holding any office in a political organization or from serving as a member of a political party committee or the national committee of a political party; and, subject to such exceptions as the Board may make, prohibits covered employees from holding any public office or engaging in any outside employment for which direct or indirect compensation is received. Upon finding a conflict of interest or breach of ethical standards, the Board must communicate this to the Governor, who may take appropriate action in accordance with the law.
Being bound by this court’s determination that the financial disclosure portion of the order is substantively constitutional (Evans v Carey, 40 NY2d 1008), plaintiffs instituted this action for a declaration that the order is unconstitutional in that it is an executive usurpation of power residing wholly within the *169 legislative domain and, hence, is violative of the separation of powers doctrine. Both Special Term and the Appellate Division found the order an unconstitutional exercise of legislative power by the Governor, inasmuch as it expands and extends existing legislation relating to conflicts of interest and ethical standards for State employees (Public Officers Law, §§ 73, 74). For the reasons which follow, the order of the Appellate Division should be modified to provide: (1) that Executive Order No. 10.1 is valid and enforceable in toto with respect to State employees whose functions are wholly within the executive department; and (2) that the portion of the order pertaining to financial disclosure is similarly valid and enforceable with respect to all other covered State employees.
I — Executive Department Officers and Employees
As chief executive officer of the State, the Governor functions in a dual capacity. His primary responsibilities, as delineated in the Constitution, include the power to make recommendations to the Legislature, the duty to approve or veto legislative enactments and the requirement that he "take care that the laws are faithfully executed” (NY Const, art IV, §§ 3, 7). Although an equal partner with the legislative and judicial branches of the government, the Governor, as head of the executive department, bears sole responsibility with respect to the oversight and internal functioning of that department (NY Const, art IV, § 1; Executive Law, § 30). In acting upon that responsibility, the Governor may promulgate any rules and regulations he determines are necessary to ensure the efficient operation of the executive department (Opinion of Justices, — NH —, 360 A2d 116; cf. Myers v United States, 272 US 52).
Thus, by virtue of the authority vested in him as chief of the executive department of the State government, the Governor possesses both the power and the duty to regulate the eligibility for employment and the conditions to be met for continued employment of persons within that department (Exchange Nat. Bank of Chicago v Abramson, 295 F Supp 87, 92; Opinion of Justices, — NH, at p —, 360 A2d, p 121, supra). So long as the Governor confines the scope of the order to employees wholly within the executive department (see Executive Law, § 31) and the scope of the order is not violative of any specific constitutional proscriptions (Evans v Carey, 40 NY2d 1008, supra; cf. Powell v McCormack, 395 US 486), *170 neither the legislative nor judicial branches are free to interfere, "it being a basic part of the organic law that each department should be free from interference, in the discharge of its own functions and peculiar duties, by either of the others” (Matter of Gottlieb v Duryea, 38 AD2d 634, 635, affd 30 NY2d 807, cert den 409 US 1008; see, also, Matter of Davies, 168 NY 89, 101-102; People ex rel. Burby v Howland, 155 NY 270, 282).
Thus, insofar as Executive Order No. 10.1 regulates the activities of State employees whose duties are confined wholly within the executive department, its promulgation represents an exercise of the Governor’s ancillary powers to effectuate the proper workings of that department. The Governor has not only the right to ascertain whether conflicts of interest or unethical behavior exist in his department, he has an affirmative duty to assure that none of his subordinates responsible for execution of executive duties are tainted by outside interests which would undermine his responsibility to "take care that the laws are faithfully executed” (NY Const, art IV, § 3). Should the Governor fail in this duty, he may be impeached. Apart from impeachment, the electorate may refuse to grant him another term of office. The Governor’s reputation and honor are unmistakably intertwined with the ability to do those things that his constitutional duties require. His control over those subordinates he must employ should not be circumscribed by the judiciary under the guise of a separation of powers inquiry.
II — Financial Disclosure by Covered Officers and Employees
Whereas the power of the Governor to promulgate Executive Order No. 10.1 with respect to employees in the executive department arises from his position as head of that department of government, a different analysis is necessary with respect to application of the order to nonexecutive employees. Ours is a system in which governmental powers are distributed among three branches — the executive, legislative and judicial. This separation of governmental powers, however, does not inflexibly ordain that the functions of each branch of government be kept wholly and entirely separate and distinct; rather "[t]he true meaning is, that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other depart- *171 merits” (Story’s Constitution [5th ed], p 393; see, also, Madison, The Federalist, No. XLVII, p 268). The validity of Executive Order No. 10.1, then, is dependent upon a showing that it was promulgated to effectuate the provisions of the Constitution or an act of the Legislature (see Matter of Broidrick v Lindsay, 39 NY2d 641, 646; Matter of Di Brizzi [Proskauer], 303 NY 206, 216). Absent this afore-mentioned showing of purpose, the act of the Governor would be tantamount to legislation by executive fiat, a clear violation of the separation of powers doctrine (see, e.g., People ex rel. Ingenito v Warden, 267 App Div 295, 299-300, affd 293 NY 803).
It is therefore necessary to examine the statutory scheme evidenced by the prohibition against conflicts of interest (Public Officers Law, § 73) and the code of ethics (Public Officers Law, § 74) in order to ascertain whether Executive Order No. 10.1 does in fact usurp legislative prerogatives. Section 73 of the Public Officers Law, forbidding certain enumerated conflicts of interest, was enacted in recognition of an express desire to guarantee that the governmental process not be subverted by official corruption and inefficiency, as well as the necessity of the "maintenance in public affairs of moral and ethical standards which are worthy and warrant the confidence of the people” (Message from Governor Dewey to the Legislature, Jan. 6, 1951). At the same time, it was recognized that it would be nothing less than a Sisyphean task for the Legislature to identify and proscribe all conflicts of interest in the myriad settings in which they might arise (cf. Fritz v Gorton, 83 Wn 2d 275, app dsmd 417 US 902), thus necessitating the establishment of a code of ethical standards for all State employees in the performance of their duties (Public Officers Law, § 74).
Accordingly, in a preamble to the code of ethics the Legislature recognized that because improper conflicts "may arise in so many different forms and under such a variety of circumstances”, that it was not only impractical but "unwise and unjust to proscribe them by statute with inflexible and penal sanctions” and that "[f]or matters of such complexity and close distinctions, the legislature finds a code of ethics is desirable to set forth for the guidance of state officers and employees the general standards of conduct to be reasonably expected of them” (L 1954, ch 696, § 1). Of necessity, then, the code of ethics is couched in broad, general terms. Thus, subdivision 3 of section 74 of the Public Officers Law provides *172 that no State employee: (a) "should accept other employment which will impair his independence of judgment in the exercise of his official duties”; (e) "should engage in any transaction as representative or agent of the state with any business entity in which he has a direct or indirect financial interest that might reasonably tend to conflict with the proper discharge of his official duties”; (g) "should abstain from making personal investments in enterprises which he has reason to believe may be directly involved in decisions to be made by him or which will otherwise create substantial conflict between his duty in the public interest and the private interest”; and that (i) "No officer or employee of a state agency employed on a full-time basis nor any firm or association of which such an officer or employee is a member nor corporation a substantial portion of the stock of which is owned or controlled directly or indirectly by such officer or employee, should sell goods or services to any person, firm, corporation or association which is licensed or whose rates are fixed by the state agency in which such officer or employee serves or is employed.”
Although the code of ethics does make provision for the discipline of a State employee in violation of its proscriptions (Public Officers Law, § 74, subd 4), it would be folly to place reliance on the individuals subject to its coverage to determine the limits of their proper conduct and to reveal the circumstances in which their own improprieties may exist. Hence, in order to make the code a viable one and to accomplish the legislative purpose, executive action is not only proper; it is of manifest necessity. It is in precisely this context that we so recently stated: "Where it is impracticable for the legislative body to fix specific standards for enforcement without destroying the flexibility necessary to meet the variety of circumstances likely to be encountered in carrying out the legislative will, broad flexibility in determining the proper methods of enforcement will be sustained” (Matter of Broidrick v Lindsay, 39 NY2d 641, 646, supra).
Concededly, there is no express provision in the code of ethics empowering the Governor to require disclosure of the financial interests of those State employees subject to Executive Order No. 10.1. On the other hand of course, there is no language in the code which would lead to the conclusion that the Legislature intended to exclusively occupy the field of governmental ethics. Indeed, the Legislature explicitly recog *173 nized that it was necessary that the code be implemented in a manner consistent with its purpose. It is in such a context that executive enforcement of a general legislative statement is proper (St. Nicholas Cathedral v Kedroff, 302 NY 1, 31). Here, the disclosure sought by the Governor is consistent with the. policies underlying the ethics legislation and should be upheld (see Illinois State Employees Assn. v Walker, 57 Ill 2d 512, cert den sub nom. Troopers Lodge No. 41 v Walker, 419 US 1058; Shapp v Butera, 22 Pa Commw Ct 229). In short, there is no going "beyond stated legislative policy”, but rather adherence to it (see Matter of Broidrick v Lindsay, 39 NY2d 641, 645-646, supra).
The Governor’s authority to order financial disclosure of State employees by means of Executive Order No. 10.1 is fully supported by section 6 of the Executive Law, which empowers the Governor "either in person or by one or more persons appointed by him for that purpose, to examine and investigate the management and affairs of any department, board, bureau or commission of the state.” This power to investigate whether State agencies are operating efficiently is coexistent with the power to ascertain whether State employees are performing their duties free from corruption or conflicts of interest in discharge of the Governor’s duty to "take care that the laws are faithfully executed” (see 1915 Opns Atty Gen 353, 354). Moreover, it is essential that the Governor obtain the information sought by Executive Order No. 10.1 so that if there are defects in the present code of ethics which affect the "condition of the state” (NY Const, art IV, § 3), the Governor might communicate them to the Legislature together with appropriate recommendations for their elimination (Matter of Di Brizzi [Proskauer], 303 NY 206, 216, supra; see, also, Matter of Sigety v Hynes, 38 NY2d 260, cert den 425 US 974).
In sum, Executive Order No. 10.1, in requiring a statement of financial disclosure of nonexecutive State employees is a proper vehicle for implementation of the broad legislative policy evidenced in sections 73 and 74 of the Public Officers Law which have the salutary purpose of eliminating corruption and conflicts of interest in State government. Here, the Governor has not encroached upon legislative prerogatives; rather, he has merely supplied the ingredients required to fill in the interstices of the statutes by fashioning a discovery device necessarily absent from the statutory scheme. In such an instance, "[t]he exigencies of government have made it *174 necessary to relax a merely doctrinaire adherence to a principle so flexible and practical, so largely a matter of sensible approximation, as that of the separation of powers” (Matter of Richardson, 247 NY 401, 410 [Cardozo, J.]).
While separation of powers is one of the principal features of our Constitution, it is the plain duty of that branch of government which is called upon to interpret the laws of this State to avoid slavish formalisms which serve only to ossify the executive without any corresponding benefit. Clearly, the function of making the laws is peculiar to the Legislature. But that is not to say that whenever the Legislature speaks on a particular subject, that subject is perforce removed from the scope of executive power. Rather, the answer is that there are some fields that are peculiar to the legislative branch, some peculiar to the executive, and others common to both. The duty of fixing the moral tone of State government and of ensuring that public servants conform their official conduct to those standards is a responsibility shared coextensively by all branches.
It is beyond cavil that the office of the Governor was deliberately fashioned as one necessarily imbued with power and independence. It is equally obvious that the framers of our Constitution did not intend to create an office in which an autocratic incumbent might arrogate any power unto himself at any time. But neither was it intended that the Governor be an automaton, constitutionally impotent to exercise the powers bestowed upon him — this being especially important at a time when, due to the events of recent years, the people demand that their public servants be free from even the barest trace of the taint of impropriety. Here, the Legislature has provided merely the bare framework within which the Governor may accomplish this task. Executive action, insofar as validly supplied by Executive Order No. 10.1, is necessary to complete it and adapt it to present day realities.
The Constitution does not denominate the Governor as merely an agent of the Legislature; nor does it ennoble him as the powerless titular head of the State. Rather the Governor is the agent of the people of the State of New York, deriving his power from them and directly responsible to them. Taken collectively, the provisions in the Constitution, providing that the Governor shall take care that the laws are faithfully executed and that the executive power shall be vested in the Governor, conclusively demonstrate that his is the office to *175 which the people look for integrity in State government. The fact that the Legislature has perfunctorily addressed the subject does not of necessity preclude further executive action. Indeed, that the Legislature has recognized that conflicts of interest by those in State government should be avoided and that these conflicts arise in myriad settings indicates that it is incumbent that the Governor take steps to combat these conflicts and the attendant official corruption they might engender. There is no cause to fear executive tyranny so long as the laws are being faithfully executed. Certainly there is no basis for fear of executive usurpation of legislative prerogatives when the Governor acts, as he did in this case, to further the workings of a program which the Legislature itself recognized as incapable of statutory completion.