### HANSEN PACKING CO. v. SWIFT & CO. et al.

District Court, S. D. New York.
April 20, 1939.

George L. Schein and Joseph M. Cohen, both of New York City, for plaintiff.

White & Case, of New York City (Lowell Wadmond, Thomas Kiernan, and Vernon Munroe, Jr., all of New York City, and Albert H. Veeder, of Chicago, Ill., of counsel), for defendants.

GALSTON, District Judge.

This is an action at law to recover treble damages for injuries suffered by the plaintiff as the result of the defendants' alleged violation of the anti-trust laws of the United States.

The plaintiff was engaged in the business of purchasing and selling cattle, sheep, lambs, calves and hogs, collectively designated as live stock, and of processing, dressing and otherwise preparing and marketing live stock and live stock products, and in the operation of a slaughter house and meat packing plant and other allied equipment and facilities near Butte, in the State of Montana. The plaintiff owned the capital stock of several subsidiaries, namely, the Hansen Market Co., the Skyland & Stock Co., Montana Horse Products Co. and Metropolitan Meat and Dairy Co., and like the defendants, was engaged in interstate commerce, though most of its products were sold in Montana, and mainly to retail stores, restaurants and hotels.

The defendant Swift & Co., the Illinois corporation, was likewise engaged in the business of dealing in live stock and live stock products, and in processing such live stock and live stock products. From time to time it acquired by purchase or otherwise the capital stock of various corporations engaged in the same line of business. The other defendant Swift & Co., the West Virginia corporation, was a subsidiary of the Illinois corporation which substantially owned or controlled all of its capital stock. The West Virginia corporation operated mainly as a sales company, selling the products processed by the Illinois corporation.

Until about April 1935 only the West Virginia corporation had obtained authority to do business in the State of Montana. On or about that date Swift of West Virginia withdrew from Montana and Swift of Illinois qualified to do business there. The various branch houses in Montana operated under the name "Swift & Co." prior to April 1935, and though in charge of a branch manager, were under the jurisdiction and supervision of division superintendents of the Illinois corporation. The defendants employed two methods for the sale and distribution of their products in Montana. The Illinois corporation employed salesmen who, operating Swift & Co.'s automobiles, traveled "car routes" in the territory assigned to them. They were furnished with price lists sent from the Illinois plant from which they quoted prices to retailers. The salesmen solicited orders from customers, executed the contracts of purchase and made collections for sales, the proceeds of which they forwarded to the plant under whose jurisdiction they were employed. These car routes ran through the eastern and southern parts of Montana, and the salesmen on these routes worked from the South St. Paul, Minnesota, and Sioux City, Iowa, plants of the Illinois corporation as their headquarters. During the period from 1928 to 1934 there were approximately half a dozen such car route salesmen in Montana. Their salaries were paid by the Illinois corporation.

In 1931 Swift & Co., the West Virginia corporation, maintained Montana branches in Butte, Helena, Missoula, Billings and Great Falls, and the properties thus occupied were until some time in 1935 owned by the West Virginia corporation. In that year they were taken over by the Illinois corporation. Sales to retailers were made at the branch house and through salesmen who traveled through the territory served by the branch houses. It appears that from 1928 to 1934 the managers of these branch houses were under the supervision of district managers employed by the Illinois corporation.

During the period in question, the companies which competed with one another in the business of selling live stock products in Montana in addition to the plaintiff and the defendants, were Armour & Co., Morrell & Co., the American Packing Co. and several smaller packing houses.

Some time in March 1931 a vexed situation developed in the Butte produce market. A former manager of defendants' Butte branch testified that in March 1931 a committee from the Amalgamated Meat Cutters Union of North America, which at that time had a local branch in Montana, notified him that the union had voted to boycott the products of Swift, Ar-

mour and Morrell that were not processed or manufactured in plants organized with union labor. This action of the union was followed by a price cutting campaign. Hams were sold to the retail trade in Butte as low as 14¢, lard around 6¢ or 7¢, bacon about 17¢ and beef for about 6¢. Those prices were markedly below the normal range.

The campaign engineered by Swift & Co. and Armour & Co., as described by Bretherton, consisted in part of getting some of the big users of ham, bacon, lard and beef to take the product of Swift and Armour at the reduced prices. It is significant as bearing upon the defense of the statute of limitations, to which reference will hereafter be made, that this period of low prices, or of the campaign, as it has been designated, lasted, as Bretherton said, "sixty days from start to finish—about sixty days."

At the conclusion of the plaintiff's case the defendants moved to strike from the record ·a number of plaintiff's exhibits which had been admitted subject to connection; and moved to dismiss the complaint on the ground that the plaintiff had failed to make out a prima facie case under either the Sherman Act (15 U.S.C.A. § 1 et seq.) or the Clayton Act (38 Stat. 730), and for the reason that the cause of action, if any, was barred by the statute of limitations.

■ It is clear that in the anti-trust acts themselves there is no limitation of action provided and accordingly, as was held in Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241, the matter of limitation is left to the local law. The plaintiff contends that the applicable local law is that of the State of New York and that in consequence its six year statute of limitation controls. But Sec. 13 of the New York Civil Practice Act must be read in that connection for it provides: *"Limitation in action arising outside of the state.* Where a cause of action arises outside of this state, an action cannot be brought in a court of this state to enforce such cause of action after the expiration of the time limited by the laws of a state or country where the cause of action arose, for bringing an action upon such cause of action, except where the cause of action originally accrued in favor of a resident of this state."

See National Surety Co. v. Ruffin, 242 N.Y. 413, 152 N.E. 246; Jacobus v. Colgate, 217 N.Y. 235, 111 N.E. 837, Ann.Cas. 1917E, 369; and Shipman v. Treadwell, 208 N.Y. 404, 102 N.E. 634. Since the plaintiff is not a resident of the State of New York it follows that Sec. 13 of the Civil Practice Act must apply to the circumstances of this case. It is idle for the plaintiff to contend that when the Supreme Court, in Chattanooga Foundry & Pipe Works v. City of Atlanta, supra, said that the local law applied, it meant that only part of the local law on limitations is to be considered. Since the acts complained of arose in the State of Montana it must follow that by the law of the forum the statute of limitations of the State of Monana ·will be the test.

■ Then the plaintiff contends that if the statute of limitations of the State of Montana is to be applied, the five year period rather than the two year period of the Montana Code shall determine. Sec. 9033 of the Montana Code provides:

*"Two-year limitation.* Within two years:

"1. An action upon a liability created by statute other than a penalty or forfeiture."

Of course, it is conceded that the action for recovery under the Clayton Act, § 4, for treble damages, 15 U.S.Code, § 15, 15 U.S.C.A. § 15, is not for a penalty ·or forfeiture, but the plaintiff urges such action is not based on a liability "created" by statute. It is asserted that the anti-trust laws are held to be a mere codification of the common law. Shelton Electric Co. v. Victor Talking Machine Co., D.C., 277 F. 433; Matter of Davies, 168 .N.Y. 89, 61 N.E. 118, 56 L.R.A. 855; Standard Oil v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734; H. J. Jaeger Research Laboratories v. R. C. A., 3 Cir., 90 F.2d 826.

None of these cases supports the proposition that the statutory liability pursuant to which this case is brought is a codification of a common law right. Of course, the common law, as in the law of libel, does permit of punitive as well as actual damages. But the treble damages of the Clayton Act define a new liability. Hocking Valley R. Co. v. New York Coal Co., 6 Cir., 217 F. 727. Moreover, in the light of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, it is difficult to understand how there can be any codification of any applicable federal general̈ law existent prior to the

enactment of the anti-trust statutes. Similar state statutes imposing limitations in actions upon a liability created by statute were considered in Seaboard Terminals Corporation v. Standard Oil Co. of New Jersey, D.C., 24 F.Supp. 1018; Foster & Kleiser Co. v. Special Site Sign Co., 9 Cir., 85 F. 2d 742, without suggestion that the Clayton Act codified rather than created a statutory liability.

Thus it follows that the two year period of limitations must be applied to the cause of action set forth in this complaint. Since it was filed in April 1934, it becomes important to determine when the last overt or tortious act was committed. The only violation of the anti-trust acts, proof of which is adduced in this cause, is that which relates to acts committed prior to July 1931, for in no subsequent period does it appear that the defendants entered into any combination or conspiracy in restraint of trade as defined in Sec. 1 of the Sherman Act (U.S. Code, Title 15, § 1, 15 U.S.C.A. § 1) or Sec. 2 of the Sherman Act (U.S.Code, Title 15, § 2, 15 U.S.C.A. § 2), nor did they "directly or indirectly * * * discriminate in price between different purchases of commodities * * * where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly in any line of commerce" as defined in the Clayton Act, § 2 (U.S.Code, Title 15, § 13, 15 U.S.C.A. § 13).

The slashing of prices in Butte involved at most a period of three months from the end of March 1931. The concerted action of large live stock producers as a defense measure was an answer to the action of the labor union in Butte and was confined to Butte and its environs. There is no evidence that these producers, by concert or otherwise, carried their price cutting to other areas. It is true that there is testimony relating to short weight and varying prices subsequent to the end of June 1931, but such measures were apparently nothing beyond what might be expected in the effort to get business when and where competition was keen.

The witness Richter, for example, formerly employed by Swift & Co., and now employed by the plaintiff, entered the employ of Swift in September 1930 as a salesman and traveled through a territory around Butte including Deer Lodge, Anaconda, Avon, Elliston, Dillon and the vicinity. He said that the price cutting in Butte and thereabouts lasted several weeks. In 1932 and subsequent times he worked for Swift in various other branch houses in Montana. He admitted that he sought to meet competition. The testimony that bears upon lowering of prices in order to get business in districts outside of Butte, both prior and subsequent to the trouble period, shows no violation of the anti-trust statutes. The most that can be drawn from the declaration of the witnesses is that in the effort to get business competition was keen. There is no evidence of any concerted effort among Swift, Armour, Morrell and the other packers other than that which related to the trouble in Butte. Certainly the testimony in respect to short weighting from shipments made out of the Billings plant, even assuming that such short weighting was deliberate—which is by no means proved—affords no evidence of a violation of either the Sherman or the Clayton Acts.

Even the exhibits giving a compilation of comparative prices of Swift and Hansen to customers in Butte, subsequent to July 1, 1931, show no systematic price cutting by Swift. Indeed in many instances Hansen's prices were lower than Swift's. The exhibits 114 to 118, which are graphs or charts purporting to show the comparison of invoices representing sales by Swift & Co. to a customer in Deer Lodge, Montana, and invoices of the plaintiff to various of its customers in the same city, demonstrate, at least for the period subsequent to July 1, 1931 that at times Swift was higher, at other times Hansen; but clearly they fail to demonstrate any price discrimination such as falls within the limitation of the anti-trust statutes.

Nor is the two year Montana statute tolled as against the Illinois corporation, for in the Montana Code bearing upon the statute of limitations there is no provision which tolls the statute against a foreign corporation not authorized to do business within the state. The defense of the statute was therefore available. See King v. National Mining & Exploring Co., 4 Mont. 1, 1 P. 727.

As a matter of fact, within the meaning of the Clayton Act, the Illinois corporation was transacting business in the State of Montana during all the period complained of and up to the filing of the complaint herein. Though the West Virginia corporation operated the branch houses, they were, as I have stated, nevertheless subject

to the supervision of division managers employed by the Illinois corporation; the Illinois corporation employed car route salesmen who solicited business in certain areas in the eastern part of Montana throughout the period complained of and as late as the middle of 1934. These salesmen were empowered not only to solicit orders but to execute contracts of sale. It was not necessary for them to obtain the confirmation of such sales by any officer or official of the home office. In addition they made collections of payments due from the customers of the Illinois corporation with whom they were doing business. Such activities clearly constituted business transacted within the State of Montana, Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 47 S.Ct. 400, 71 L. Ed. 684. During the entire period it was entirely possible, under the provisions of the Clayton Act, to bring suit not only in the judicial district of which it was an inhabitant but also in any district where it could have been found or transacted business, and all process in such cases may be served in the district of which the corporation is an inhabitant or wherever it may be found. Clayton Act, § 12, U.S.Code, Title 15, § 22, 15 U.S.C.A. § 22; Eastman Kodak Co. v. Southern Photo Co., supra; International Harvester Co. v. Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479.

In this view of the case it becomes unnecessary to pass on that part of the defendant's motion to dismiss which asserts that plaintiff has failed to make out a case under Sec. 2 of the Clayton Act, 15 U.S. C.A. § 13, because no evidence was introduced to show price discriminations in interstate commerce. However, I have given consideration to the subject, as well as to the contention that no ascertainable damages were proved.

On the question of interstate commerce, reliance is had on Lipson v. Socony Vacuum Corporation, 1 Cir., 87 F.2d 265. There the plaintiff, a dealer in gasoline, sought to recover treble damages for price discrimination. The gasoline was shipped from the defendant's refineries not for delivery to any particular customer but to be stored for sale to the public. The court concluded that interstate commerce ended when the gasoline was received by the defendants in Massachusetts for storage, and that the sales and deliveries thereafter to retail customers were in intrastate commerce.

I think that the facts proved in the case at bar may be distinguished from the Lipson case. It appears that during the trouble the Butte branch communicated with officers of the Illinois corporation in Denver or Chicago; that shipments of cars arrived in Butte, and so great was the demand for the low priced commodities that trucks from customers went directly to the arriving car and deliveries were made directly from the car. Moreover, it appears that the products were sold speedily during the trouble period and there was nothing in the proof to lead one to believe that as to the commodities that came in during that time, received by the Butte branch, they stayed long enough to be commingled with other commodities if any such were in the branch house. It would be a wholly unrealistic inference to conclude from the facts established in this case that there was not a constant stream of commerce from without the state to customers within the city of Butte. Local 167, etc. v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804.

Also on the question of damages I am unable to agree with the contention made that the plaintiff should be foreclosed because it is unable with certainty to establish the extent of its damages. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L. Ed. 544, points a rule of reasonable and probable estimate that where from the nature of the case damages can not be measured with certainty by a fixed rule, the facts and circumstances tending to show the probable amount should be submitted to the jury to enable them to form an estimate. See, also, American Can Co. v. Ladoga Canning Co., 7 Cir., 44 F.2d 763; Rankin Co. v. Associated Bill Posters of United States, 2 Cir., 42 F.2d 152. Certainly the lowered prices prevailing in Butte during the period of the labor trouble led to a reduction in sales with consequent damages to the plaintiff. However, in the view taken of the defense of the statute of limitations, the complaint must be dismissed.